K1G8KAUC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MICHAEL PHILIP KAUFMAN,

              Plaintiff,

         v.                           16 Cv. 2880 (AKH)

MICROSOFT CORPORATION,

              Defendant.

------------------------------x
                                   New York, N.Y.
                                   January 16, 2020
                                   11:00 a.m.

Before:

                    HON. ALVIN K. HELLERSTEIN,

                                       District Judge

                          APPEARANCES

LISTON ABRAMSON LLP
     Attorneys for Plaintiff
BY:  RONALD ABRAMSON
     ARI J. JAFFESS
     ALEX G. PATCHEN

FISH & RICHARDSON P.C.
     Attorneys for Defendant
BY:  AHMED J. DAVIS
     JASON W. WOLFF
     LEAH A. EDELMAN
     EXCYLYN HARDIN-SMITH

K1G8KAUC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3   appearances for the record.

4          MR. ABRAMSON:  Ronald Abramson, of Liston & Abramson

5   LLP, for the plaintiff, Michael Philip Kaufman, and with me are

6   Ari Jaffess and Alex Patchen of my firm.

7          THE COURT:  And you are?

8          MR. KAUFMAN:  Michael Kaufman.

9          THE COURT:  OK.  For the defendant.

10          MR. DAVIS:  Good morning again, your Honor.  My name

11   is Ahmed Davis, from the law firm of Fish & Richardson, on

12   behalf of Microsoft.  I have here with me my colleagues Jason

13   Wolff, Leah Edelman, and Excylyn Hardin-Smith.

14          THE COURT:  Thank you very much.

15          We will begin by doing the motion and it's defendant's

16   motion.  So Mr. Davis.

17          MR. DAVIS:  Thank you, your Honor.  We have actually

18   split the argument up into three parts.  So Mr. Wolff is going

19   to handle the summary judgment of noninfringement, Ms. Edelman

20   will handle the argument with respect to Schemalive, and

21   Ms. Hardin-Smith will handle the argument with respect to

22   willfulness.

23          THE COURT:  Go ahead.

24          MR. WOLFF:  Thank you, your Honor.

25          THE COURT:  Mr. Wolff, one of the first things about a

K1G8KAUC

litigator is to speak loudly and clearly.

MR. WOLFF:  I will do my best, your Honor.

I am going to handle the noninfringement summary judgment motion.  That's Docket No. 111.  My colleagues will handle the other parts of it, as Mr. Davis had mentioned.

If I could start by refreshing your Honor what this case is about.  It's about software that is used by people to access databases.  And there's two parts to this software that kind of matter for the summary judgment motion.  One is what happens when you write code for these computer applications. And the second is what happens when you run the code for the computer applications, in other words, what the user might see.

If anything should be apparent to your Honor from the briefing, it's that there is a claim construction dispute between the parties.  This is a legal issue that needs to be resolved before trial under *02 Micro*, that's 521 F.3d 1341, cited in the briefs.  And the reason it needs to be resolved is because it will simplify the presentation of evidence to the jury, it will reduce juror confusion, and it will align the prosecution and defense of the claims between the parties, and it will void issues for appeal.

Now, Microsoft's noninfringement motion depends on two claim construction issues.  And under either one, Microsoft contends Mr. Kaufman has not shown that there is a genuine issue of triable fact that would warrant having a trial, and

K1G8KAUC

1     that if either is decided in Microsoft's favor, summary

2     judgment should be granted.

3           Now, how did we get here?  As the case progressed, Mr.

4     Kaufman's infringement theory changed.  In his Local Patent

5     Rule 6 disclosures, which were Docket No. 33, he identified

6     Microsoft ASP.NET Dynamic Data as the alleged infringing

7     product.

8           Now, as discovery progressed, and we received Mr.

9     Kaufman's expert report from Dr. Dennis Shasha, he changed that

10    theory.  He changed that theory and acknowledged in a sense

11    that the scanning limitation was not performed by the accused

12    product, Microsoft ASP.NET Dynamic Data.  And what he did is he

13    changed that theory to say that, when a person uses some other

14    software, Visual Studio, and invokes another special tool

15    called an Object Relational Mapper, that now the scanning

16    limitation is satisfied.

17          He never supplemented his local patent rule

18    disclosures.  He never told us he was changing the theory.  So

19    now we are with a claim construction dispute where the two

20    sides have fundamentally differing views on what the claims

21    mean.  The first is the scanning limitation, and the second is

22    a limitation found in claim C, or subpart C of the claims,

23    which refers to integrating into each of the mode's display

24    processes for representing, navigating, and managing records

25    across tables.

K1G8KAUC

1              So let me first address the scanning limitation.  Mr.

2       Kaufman's expert has two constructions, one for validity and

3       another for infringement.  If you have at your disposal, and I

4       can hand it to you if it would help, Docket No. 113-14, this is

5       Exhibit N to the summary judgment motion.  Would your Honor

6       like a copy?

7              THE COURT:  Just talk.  If I want it I can get it.

8              MR. WOLFF:  OK.  If we turn to this, this is Dr.

9       Shasha's invalidity report, or a rebuttal to Microsoft's

10      invalidity report.  He explains on paragraph 57 -- and this is

11      at ECF page 7 of 24 -- that human effort in the prior art is

12      required to build applications.  And that is not permitted

13      under his claims.

14             At paragraph 58, he expressly says what the word

15      automatic means.  And he says that automatic means --

16             THE COURT:  Are you building to an argument that

17      Microsoft's process is not automatic, entirely automatic, and

18      therefore not an infringement, is that the point?

19             MR. WOLFF:  Yes, your Honor.

20             THE COURT:  How do I know that without having your

21      process proved and displayed?

22             MR. WOLFF:  We can look at the papers that were

23      submitted in the summary judgment, Mr. Kaufman's expert's

24      report, where he walks through the manual steps that the

25      developer must do in order to perform the scanning limitation.

K1G8KAUC

|   |   |
|---|---|
| 1 | He says the same thing in paragraph 61, that the prior |
| 2 | art requires human effort, and that's not permitted by his |
| 3 | claims.  The same thing again in paragraph 64 and 86 and 89.  I |
| 4 | won't recount all the things he said.  You have the papers in |
| 5 | front of you. |
| 6 | THE COURT:  What ECF number is this? |
| 7 | MR. WOLFF:  113-14.  And the clearest example, as I |
| 8 | mentioned before, is paragraph 58. |
| 9 | THE COURT:  Exhibit N? |
| 10 | MR. WOLFF:  Yes, your Honor.  I'm sorry.  Paragraphs |
| 11 | 55 and 58 make the exact same statement, which is that |
| 12 | automatic -- |
| 13 | THE COURT:  You want me to go from 55 to 58. |
| 14 | MR. WOLFF:  Yes.  And it's the last sentence in |
| 15 | paragraph 55.  And it concludes "automatic," and in parentheses |
| 16 | "meaning no human labor required." |
| 17 | He says the same thing in paragraph 58, and throughout |
| 18 | the report he says pretty much the same thing. |
| 19 | Now, in Dr. Shasha's infringement report -- |
| 20 | THE COURT:  That's what I am looking at. |
| 21 | MR. WOLFF:  Exhibit N is his rebuttal report on |
| 22 | invalidity. |
| 23 | THE COURT:  Dr. Shasha's paragraph 55 begins with |
| 24 | Mr. McGoveran, is that right? |
| 25 | MR. WOLFF:  Yes. |

K1G8KAUC

1          THE COURT:  And what is it in that paragraph 55 that

2     you want to bring to my attention?

3          MR. WOLFF:  The last clause in the paragraph, where he

4     explains that Microsoft's expert is conflating no programming

5     with automatic, meaning no human labor required.  And he is

6     saying that automatic does not allow human labor.

7          So this is his response to Microsoft's prior art that

8     it put in the case.

9          THE COURT:  Why are we talking about prior art?  We

10    are talking about infringement, aren't we?

11         MR. WOLFF:  We are.  The point I am making is that

12    there is a claim construction dispute, and Mr. Kaufman's expert

13    has two constructions for automatically generating and how that

14    relates to the scanning limitation.

15         THE COURT:  I was asked to define automatic, wasn't I?

16         MR. WOLFF:  You were, your Honor, in the original

17    briefing.

18         And if I may --

19         THE COURT:  One minute.

20         MR. WOLFF:  The parties withdrew the request for the

21    construction, and this is before Mr. Kaufman changed his

22    infringement theory.

23         THE COURT:  Well, I didn't define automatic.  I

24    defined only that which was in dispute.

25         MR. WOLFF:  Correct.  And the parties submitted a

K1G8KAUC

1    paper to your Honor, at Docket No. 62, where they said that

2    they seemed to agree on what the meaning of this term was.  I

3    have that if you would like it.  I could hand it to your Honor.

4              THE COURT:  What was your agreement?

5              MR. WOLFF:  Well, the agreement specified in there,

6    Microsoft said just what it said here, which is that automatic,

7    as it's used in the claims and applied to the scanning

8    limitation, means that no separate developer input occurs.

9              THE COURT:  Is that satisfactory to the plaintiff?

10             MR. WOLFF:  I don't know.

11             THE COURT:  I am asking the plaintiff.

12             Is it satisfactory to you, Mr. Abramson?

13             MR. ABRAMSON:  Your Honor, could you repeat that,

14   please?

15             THE COURT:  No separate developer input occurs.

16             MR. ABRAMSON:  Your Honor, we have to be careful about

17   what is the subject matter of that, but for the actual scanning

18   limitation itself, we agree.  We agree.  The actual scanning

19   operation itself, we agree.

20             THE COURT:  Go ahead.  Proceed.

21             MR. WOLFF:  Mr. Abramson is qualifying the agreement.

22   But the point that Mr. Kaufman's expert made in the rebuttal

23   report on invalidity was that no human effort could occur,

24   which is essentially the same thing as no separate developer

25   input occurs.  It precludes the developer from doing anything,

K1G8KAUC

1  from clicking on menus, from doing pull-downs, and writing

2  code.

3          THE COURT:  And your position is that there is some

4  developer input.

5          MR. WOLFF:  Exactly, your Honor.

6          THE COURT:  How do you prove that?

7          MR. WOLFF:  How I prove that is that I turn to Exhibit

8  C, which is Docket No. 113-3, and this is Dr. Shasha's

9  infringement report, and at paragraphs 37 through 50, he

10 illustrates all the developer input, or most of it, that he had

11 to do to generate one of these programs.

12         And if you will turn to paragraph 37, and this is at

13 page 5 of 17, Docket 117-3.

14         THE COURT:  It shows what happens when Visual Studio

15 is opened.

16         MR. WOLFF:  Correct.  Visual Studio is not the alleged

17 infringing product.

18         And from this, in paragraph 38 --

19         THE COURT:  Visual Studio is not what?

20         MR. WOLFF:  Is not the alleged infringing product.

21         THE COURT:  How do you prove that you have human

22 involvement, that there is separate developer input?

23         MR. WOLFF:  By stepping through the steps that he

24 illustrated in this report.  And if you could indulge me, I can

25 walk you through each one of these so you can see what is

K1G8KAUC

1    happening.

2              THE COURT:  Go ahead.

3              MR. WOLFF:  At paragraph 38, he shows that the

4    developer has to create a new project.  And here he said that

5    you had to specify it by using a mouse and clicking on ASP.NET

6    Dynamic Data entity's website, and then you would click on the

7    OK button at the bottom of the screen capture.

8              The next thing you would have to do is shown at

9    paragraph 39.  Here, he shows that the developer needs to add a

10   relational database to the project.

11             THE COURT:  He says the selection in this case, and

12   that goes back to the previous selection.

13             MR. WOLFF:  Right.  He is identifying some of the code

14   that gets generated.

15             THE COURT:  Where is that?

16             MR. WOLFF:  It's at the last clause at the sentence on

17   paragraph 39.

18             THE COURT:  So that ASP.NET Dynamic Data entity's

19   website appears on the screen third from the bottom.

20             So you are saying that the developer has to check

21   that, he has to click on that?

22             MR. WOLFF:  Are you referring to paragraph 38?

23             THE COURT:  Yes.

24             MR. WOLFF:  Yes, your Honor.

25             THE COURT:  The developer would double click that?

K1G8KAUC

| | |
|---|---|
| 1 | MR. WOLFF:  Correct. |
| 2 | THE COURT:  Is it your contention that shows human |
| 3 | involvement? |
| 4 | MR. WOLFF:  It does, your Honor. |
| 5 | THE COURT:  So that in itself contradicts automatic. |
| 6 | MR. WOLFF:  Correct. |
| 7 | THE COURT:  And that's why you think you're not |
| 8 | infringing. |
| 9 | MR. WOLFF:  It's not the only reason. |
| 10 | THE COURT:  It's one reason. |
| 11 | MR. WOLFF:  It's one.  If we get to the other |
| 12 | paragraphs, I can show you where he identifies the scanning |
| 13 | limitation being performed. |
| 14 | THE COURT:  Go ahead. |
| 15 | MR. WOLFF:  So after the developer has clicked on this |
| 16 | project, and here Dr. Shasha's shows in paragraph 40 the |
| 17 | developer has to open up another menu, has to go find this |
| 18 | database called AdventureWorksLT2012_Data.mdf. |
| 19 | THE COURT:  It says, "Visual Studio automatically |
| 20 | generates various files for the website, which collectively are |
| 21 | called a 'solution,' including the 'Global.asax' file discussed |
| 22 | later." |
| 23 | So we have a screen. |
| 24 | MR. WOLFF:  Right.  Are you looking at paragraph 40? |
| 25 | THE COURT:  I am looking at 39. |

K1G8KAUC

1          MR. WOLFF:  So paragraph 39 is referring to the figure

2     that's under it.

3          THE COURT:  And Global.asax appears on the screen as a

4     subset to default.

5          MR. WOLFF:  Correct.  And this would be some of the

6     project files the programmer is going to have to go back and

7     modify in subsequent steps.

8          THE COURT:  That is another example of why human

9     beings are involved and it's not automatic.

10          MR. WOLFF:  Exactly.

11          THE COURT:  Let me stop you there.  I will get back to

12     you.  I want to get Mr. Abramson's take on this so far.

13          MR. ABRAMSON:  Thank you, your Honor.

14          I would say that, as far as this is concerned, the

15     issue is what has to be automatic?  And if you look at the

16     brief, the focus of the brief on summary judgment --

17          THE COURT:  Let's look at this.

18          MR. ABRAMSON:  The focus of the brief was on the

19     scanning step that Mr. Wolff was talking about.  The scanning

20     step has to be automatic, the step of scanning the database.

21     And all we have seen here is the step of telling it what

22     database to scan.

23          THE COURT:  So you have to have a human being instruct

24     as to the particular database that you're interested in.  Once

25     he does that, makes that double click, he is finished.

K1G8KAUC

1          MR. ABRAMSON:  When you are done on that, you will see

2     in the next paragraph it mentions a file Model.edmx.  That is

3     the output.  The scanning is done at that point.  So you tell

4     it what database to scan, and you tell it to go, to scan, and

5     automatically --

6          THE COURT:  Let me get back to Mr. Wolff.

7          Your response.

8          MR. WOLFF:  My response would be to point to paragraph

9     41, 42, 43, 44 --

10         THE COURT:  Take it slow.

11         MR. WOLFF:  -- and 45.

12         Mr. Abramson kind of skipped over some of these steps.

13    You don't just point to the database.  You have to add the

14    database, in paragraph 41, which shows up on the screen.  The

15    screen has now changed for the user.  The developer is then

16    going --

17         THE COURT:  The user has clicked on that certain file.

18         MR. WOLFF:  Correct.

19         THE COURT:  And out comes of the database that is

20    depicted at paragraph 41.  Then the user picks out what he

21    wants.

22         MR. WOLFF:  The next thing the user has to do is tell

23    the software Visual Studio that he needs to open a new type of

24    a program, called an Object Relational Mapper.

25         THE COURT:  So Mr. Abramson would say that each

K1G8KAUC

1    particular step is automatic, but the choice of which

2    particular files you want is a human's choice.

3                MR. ABRAMSON:  I would actually say that the scanning

4    step is automatic, and I would look at these figures.  The

5    Object Relational Mapper comes up in this process.  As soon as

6    you tell it what database to pick, the Object Relational Mapper

7    is the default.  You just click OK.

8                THE COURT:  Let's go back to the claim and show me

9    what in the claim reaches this particular point.

10               MR. ABRAMSON:  In the claims --

11               THE COURT:  Claim 1.

12               MR. ABRAMSON:  In Claim 1 --

13               THE COURT:  Line.

14               MR. ABRAMSON:  Bear with me on the line.  I don't have

15   the line numbers in this copy.

16               MR. WOLFF:  Mr. Abramson, would you like a copy of the

17   claim?

18               MR. ABRAMSON:  I have the claims.

19               If you look at line 20.

20               THE COURT:  "Causing said server to scan said database

21   and apply a body of rules to determine the table structures,

22   constraints and relationships of said data model, and store

23   representations thereof in machine-readable media accessible to

24   said server."

25               So causing is the result of human intervention, is it

K1G8KAUC

1    not?

2              MR. ABRAMSON:  The actual act of causing the server to

3    scan the database presumes that we have already identified the

4    database.  So the human effort is telling it to go.

5              THE COURT:  That's what causing means.

6              MR. ABRAMSON:  That's it.

7              THE COURT:  What is your take on that, Mr. Wolff?

8              MR. WOLFF:  Referring back to the claim, and

9    particularly the preamble, line 2, for automatically generate,

10   a processer -- I'm sorry, line 1.

11             THE COURT:  "A method for operating a server

12   comprising a processer for automatically generating an end-user

13   interface."

14             MR. WOLFF:  Correct.  We can stop right there for a

15   second.  And the reason that clause is important is because the

16   "automatically generating" language applies and brings life and

17   meaning into each limitation, steps A, B and C.  And as a

18   consequence, it is the processer, not the user, that needs to

19   be performing each of the steps A, B and C.

20             THE COURT:  The processer may use the step, but the

21   human being is saying which step to deal with.

22             MR. WOLFF:  The human being is saying which step to

23   deal with, but the process is more involved than just

24   identifying a database.

25             As it shows in document 113-3, paragraph 42, you have

K1G8KAUC

1    to go in to this software tool Visual Studio.  You need to open

2    this Object Relational Mapper, which is called LINQ to SQL or

3    an ADO.NET Entity Framework.  You can see the selections in the

4    figure there.  There's four different options that the user can

5    select for its preferences.

6          The next step in paragraph 43 shows that the user

7    needs to then select the database and click continue.

8          The following paragraphs --

9          THE COURT:  So each particular step automatically

10   generates an end-user interface.

11         MR. WOLFF:  No.  We are not even to limitation C.

12         THE COURT:  I am reading from the first sentence, line

13   1.  "A method for operating a server comprising a processer for

14   automatically generating an end-user interface."  That's where

15   the word automatic appears.

16         MR. WOLFF:  Yes, your Honor.

17         MR. ABRAMSON:  Your Honor, if I may.

18         THE COURT:  Yes.

19         MR. ABRAMSON:  If you look at the end of the preamble,

20   it says "said method comprising," and it has A, B and C.

21         What has to be automatic, your Honor is A, B and C.

22   The preamble of the claim presumes you're going to go through

23   the operation.  The whole purpose of this invention is to be

24   able to take any arbitrary database, just pick any database,

25   and automatically create a user interface for it.

K1G8KAUC

| | |
|---|---|
| 1 | THE COURT:  I understand that. |
| 2 | MR. ABRAMSON:  You have to tell it what database to |
| 3 | use.  And we are talking now about the step B. |
| 4 | THE COURT:  I have got it, Mr. Abramson. |
| 5 | MR. ABRAMSON:  So step B -- |
| 6 | THE COURT:  Let Mr. Wolff finish. |
| 7 | MR. WOLFF:  So the point is that the user has to go |
| 8 | through and specify all these preferences, by clicking on |
| 9 | menus, clicking on pull-down menus, specifying parameters, in |
| 10 | order to have the scanning function occur.  So by definition it |
| 11 | is not automatic; it's requiring separate developer input. |
| 12 | THE COURT:  Automatic, does that appear anyplace other |
| 13 | than line 2? |
| 14 | MR. WOLFF:  It does refer to other spots in the claim |
| 15 | where it refers to automatic. |
| 16 | THE COURT:  Line 2 is automatically generating.  Once |
| 17 | there is a choice and a selection, then there is an automatic |
| 18 | generation of its end use. |
| 19 | MR. WOLFF:  We haven't even generated the user |
| 20 | interfaces yet.  We are still at the process of just telling |
| 21 | what preferences the developer has for how to set up and |
| 22 | generate -- to scan the database to generate a data model. |
| 23 | MR. ABRAMSON:  Your Honor, that's not correct.  The |
| 24 | set up that's involved here is identifying the database.  The |
| 25 | Object Relational Mapper, if you look at paragraph 42, the |

K1G8KAUC

1  black thing that's highlighted, that's the default that's given

2  to you automatically by that screen.  You don't have to go find

3  it, select it, tell it what it is.  It's there.

4         THE COURT:  Let me stop you both.  If we were to have

5  a trial on this issue, would you, Mr. Wolff, be trying this on

6  the basis of an actual use of your procedures or would you be

7  trying it through the words of the plaintiff's expert?

8         MR. WOLFF:  Both.

9         THE COURT:  Would you not be better off in allowing

10  the proof to come in before I can deal with this issue, where

11  you're both arguing in different ways and there is no real

12  rationale for me to say who is right and who is wrong?

13         MR. WOLFF:  Your Honor, the issue is that the parties

14  have a fundamental disagreement as to the meaning of the

15  automatic and how that applies to the scanning and each of

16  these limitations here.

17         THE COURT:  It's not that you're disagreeing on the

18  word automatic.  You're disagreeing on when an automatic

19  operation comes into play and when it ends.

20         MR. WOLFF:  And from start to finish, the only thing

21  that was supposed to happen in the patent is to identify a

22  database.  No other steps, no other user interfaces were

23  supposed to be presented to the user except the final step, the

24  database access interfaces which are found at step C.

25         THE COURT:  I am not able to give you summary judgment

K1G8KAUC

1     on this issue.  It's not clear in my mind.  I struggled with

2     this and with the language.  In the *Markman* hearing, I

3     expressed reluctance to interpret matters in a way that would

4     aid one party and not the other.  I was struggling to find a

5     neutral definition of terms, not to add terms, not to subtract

6     terms, but to give interpretive value to the entire expression,

7     in the context of the invention.

8               I can't tell you who is right, whether there is

9     contemplated a human selection that itself will then cause an

10    automatic generation of some other function or some other

11    result or whether everything has to be automatic.

12              MR. WOLFF:  Can we resolve the claim construction

13    issue?

14              THE COURT:  Which one?

15              MR. WOLFF:  Automatic.

16              THE COURT:  You agreed on a definition.

17              MR. ABRAMSON:  I think we have resolved it.

18              THE COURT:  No separate developer impact occurs.

19              MR. WOLFF:  Input.

20              THE COURT:  No separate developer input is required.

21              MR. WOLFF:  All right.  Let me address the second

22    issue since I know where your Honor is headed on that.

23              The second issue relates to limitation C in the

24    patent, limitation C in each of the claims.  And if you will

25    refer to the claim, paragraph 377 of the patent, line 31.

K1G8KAUC

1          THE COURT:  Yes, I have it in front of me.

2          MR. WOLFF:  It says, "Integrates into each said mode

3     display processes for representing, navigating and managing

4     said relationships across tables."

5          There is another claim construction dispute here.

6          THE COURT:  And I was asked at the *Markman* to define

7     "and" as "and/or," and I declined to do so.

8          MR. WOLFF:  Correct.

9          THE COURT:  And the parties have different arguments

10    here.

11         MR. WOLFF:  Correct.  Mr. Kaufman's position is that

12    it means and/or, meaning that each said mode does not need to

13    have all three display processes.  And Microsoft's position is

14    that each process must have each process:  Representing,

15    navigating, and managing.  And this is just a basic grammar

16    issue.  There is no factual dispute on this issue.

17         THE COURT:  Mr. Abramson.

18         MR. ABRAMSON:  Yes, your Honor.  I don't know that

19    it's a dispute over exactly what the word "and" means.  It's a

20    dispute over what the word "and" implies for the construction.

21         Microsoft is arguing here that the word "and" means

22    that, not only must each mode display integrate some processes,

23    but that it also has to integrate each and every one of the

24    listed processes.  Our position on this is the word "and"

25    serves to define the set of processes that have be integrated

K1G8KAUC

1  in the displays.  It doesn't go so far as to say that each and

2  every process must be integrated into each display.

3          THE COURT:  Integrates into each said mode.  And we

4  define mode as creation, retrieval, anything deleting.

5          MR. ABRAMSON:  Actually, it's integrates into each

6  said mode display.  The subject of that is mode display.  Then

7  what gets integrated is processes.  I don't know if that's a

8  huge distinction, but I think that's the proper parsing.

9          Integrates into each said mode display processes for

10  A, B and C.  That means to us -- this is the key thing.  You

11  have to interpret that in light of the specification.  You

12  can't just blindly apply rigid rules of grammar to this.  The

13  case law is very clear on this, the case law that we cited,

14  including a decision by Judge Rakoff in 2019.  It's very clear

15  that this is the type of interpretation where you can't just go

16  by the niceties of grammar, you have to look at the

17  specifications.

18          THE COURT:  We can start with the niceties of grammar.

19          What are the niceties of grammar here, Mr. Wolff?  The

20  phrase "integrates into each said mode display processes for

21  representing, navigating and managing said relationships across

22  tables."  One illustration you gave is that in the delete mode,

23  when something is eliminated, it's no longer represented, and

24  you don't need to navigate it because it's not there anymore.

25  And those two functions are absent from the delete mode.  They

K1G8KAUC

1    may be present in another mode.

2         Mr. Abramson argues that the integration into each

3    mode does not necessarily mean that each of the processes has

4    to be reflected in that particular mode.  So as long as you

5    cross the spectrum of the invention, have display processes for

6    representing, navigating, and managing, then you satisfy the

7    claim.

8         I don't know how artful that was, Mr. Abramson.

9         MR. ABRAMSON:  I think that's accurate, and we would

10   refer to -- reading this in light of the specification, where

11   the specification says in the patent, on column 11, lines 45

12   through 49, UI is rendered for any given database table where

13   underlying object representation is referenced.  That's the

14   result of the scanning we just talked about.  And appropriate

15   components for depicting and traversing all cross-table LINQs

16   are automatically included in the resulting display.

17        So read in light of the specification, that's what it

18   means.  And if you interpret it the way Microsoft wants to

19   interpret it, then the claim does not apply to any embodiment

20   in the specification.  It's a red flag.  There is no embodiment

21   in the specification that integrates into each mode display

22   each of those processes.

23        THE COURT:  Mr. Wolff, I can't define this further.

24   We have the terms as they are, and they are not susceptible to

25   further definition.

K1G8KAUC

1          MR. WOLFF:  Microsoft's position has been from the

2    start that this is clear, the claim language.  This patent was

3    filed in 2001.  It was prosecuted for years.  An amendment was

4    filed six years later in 2007, prosecuted for another four

5    years.  Mr. Kaufman sued Microsoft five years later.  The

6    language of the claim is clear and unambiguous.  Read it says

7    each mode display has processes for representing, navigating,

8    and managing.  It has all three.

9          THE COURT:  I can't define on summary judgment whether

10   your reading of this phrase or Mr. Abramson's reading of this

11   phrase, as applied to the alleged infringing device or method,

12   is the right one.

13         MR. WOLFF:  Your Honor, can you resolve the claim

14   construction issue that you raised earlier, and that was

15   confirm that "and" does not mean "and/or."

16         THE COURT:  I am not confirming anything.  We have the

17   phrase as it is.  It is a mistake to try to single out a single

18   word and give it meaning.  It's used as it is.  I am not able

19   to make further definition in it, and we will have to deal with

20   the entire phrase and see how it fits the evidence.

21         The motion for summary judgment is denied, at least

22   the specs that Mr. Wolff is arguing.

23         What is the next point?

24         MR. WOLFF:  Thank you, your Honor.

25         MS. EDELMAN:  Good morning, your Honor.  Leah Edelman

K1G8KAUC

1    for Microsoft.  I will be addressing the partial summary

2    judgment on the Schemalive issue.

3            This issue is about Mr. Kaufman's local patent rule

4    disclosure where he claimed that Schemalive, as disclosed in

5    the '981 patent, practices the '981 patent.

6            THE COURT:  One minute.

7            You need something, Mr. Abramson?  Take a minute.  Are

8    you OK?

9            MR. ABRAMSON:  I lost my pen.

10           THE COURT:  OK.  You found it.

11           MR. ABRAMSON:  I did.

12           THE COURT:  Go ahead, Ms. Edelman.

13           MS. EDELMAN:  The fact is that Schemalive, as

14   disclosed in the '981 patent, does not practice the '981 patent

15   claim.

16           THE COURT:  Schemalive is the plaintiff's methodology?

17           MS. EDELMAN:  The Schemalive product is separate from,

18   to be distinguished from the Schemalive reference

19   implementation which is disclosed verbatim in the '981 patent

20   specification.

21           THE COURT:  What are you telling me, that the machine

22   and the process used by the plaintiff is not an embodiment of

23   the patent?

24           MS. EDELMAN:  All we are saying is that Mr. Kaufman

25   made a claim under the local patent rules that applied in this

K1G8KAUC

| | |
|---|---|
| 1 | case, and he said that Schemalive practices the '981 patent. |
| 2 | THE COURT:  Did I ever order those to be applicable? |
| 3 | MS. EDELMAN:  No, your Honor.  They were under the |
| 4 | original scheduling order that was ordered by Judge Swain at |
| 5 | the infancy of this case. |
| 6 | THE COURT:  I didn't follow those rules. |
| 7 | MS. EDELMAN:  That's correct, your Honor.  But the |
| 8 | parties agreed to them under that original scheduling order, |
| 9 | and you can see in the pleadings that those infringement -- |
| 10 | THE COURT:  What do I care what the plaintiffs |
| 11 | actually do? |
| 12 | MS. EDELMAN:  It's a disclosure issue, your Honor. |
| 13 | THE COURT:  It leads to what?  It's not relevant. |
| 14 | MS. EDELMAN:  It is relevant, your Honor. |
| 15 | THE COURT:  How?  I am measuring infringement by what |
| 16 | the defendant does, not by what the plaintiff does. |
| 17 | MS. EDELMAN:  The disclosure, your Honor, is relevant |
| 18 | to these issues because, as your Honor correctly points out, |
| 19 | infringement is only between the patent claims and the accused |
| 20 | product. |
| 21 | THE COURT:  Right.  What do I care how the embodiment |
| 22 | in plaintiff's practices work?  I don't care. |
| 23 | MS. EDELMAN:  You're right, your Honor.  The jury |
| 24 | shouldn't care either, but the jury might get confused. |
| 25 | THE COURT:  It won't get confused.  There won't be any |

K1G8KAUC

1    evidence of it.

2              MS. EDELMAN:  Regarding Schemalive?

3              THE COURT:  That's the plaintiff's work?

4              MS. EDELMAN:  Yes.

5              THE COURT:  You need it?  You want it, Mr. Abramson?

6              MR. ABRAMSON:  Absolutely, your Honor.

7              THE COURT:  Why?

8              MR. ABRAMSON:  This is a demonstrative of how this

9    invention works.  Absolutely we want to be able to demonstrate

10   reference limitation in the specification of the patent.

11             THE COURT:  I don't think it's relevant.

12             MR. ABRAMSON:  Well, it's relevant to explain the

13   technology, to explain the background and what Mr. Kaufman

14   invented, because they are attacking this as being anticipated

15   by prior art.

16             THE COURT:  We measure the claims against the prior

17   art.

18             MR. ABRAMSON:  We measure the claims against the prior

19   art, but it is a demonstrative, it's an aid to the jury.  How

20   does this technology work?  I think it's very relevant to take

21   the actual working example in the patent.

22             THE COURT:  You have an enablement in the patent

23   itself.

24             MR. ABRAMSON:  We have an enablement.

25             THE COURT:  And that's how it works.  And we don't

K1G8KAUC

1    take into consideration how you actually use devices or

2    processes.  It's not relevant.

3            MR. ABRAMSON:  The entire disclosure, all the figures

4    in the patent, is based upon the operation of this software

5    machine, this machine.

6            THE COURT:  That's not part of the patent application.

7            MR. ABRAMSON:  It is the entire specification.

8            THE COURT:  Then we will deal with the specification.

9            MR. ABRAMSON:  We have taken literally what is in the

10   specification.  It's a couple of hundred pages of code, that's

11   why it's so thick.  We just ran the code on the machine.

12   That's a demonstration which I think is the most helpful thing

13   that the jury could see to understand what that invention is.

14   Let's see it run.  Let's see it work.

15           THE COURT:  That's not relevant.

16           MR. ABRAMSON:  If I can't show that to the jury, then

17   it's going to become very difficult, abstract.  I will be

18   limited to demonstrating their product, which we can certainly

19   do.

20           THE COURT:  That's what you have to do.  That's the

21   infringement issue.

22           MR. ABRAMSON:  I want Mr. Kaufman to be able to do

23   that.  If he can't show his own product --

24           THE COURT:  Let me have a moment.

25           (Pause)

K1G8KAUC

1          THE COURT:  Let me ask you what you want to prove.

2     You want to prove that Schemalive -- is that how it's

3     pronounced?  You want to prove that that in which plaintiff

4     does is the embodiment of the patent.

5          MR. ABRAMSON:  I don't want to prove that, your Honor.

6          THE COURT:  What do you want to prove?

7          MR. ABRAMSON:  I want to prove that Microsoft's

8     product infringes the patent, and I want to use the example in

9     the patent specification itself to explain to the jury how the

10    invention works.

11         THE COURT:  If you are going to compare what Microsoft

12    does with what the plaintiff does, you have to have an ability

13    to prove that what the plaintiff does is what the patent

14    teaches.  Otherwise you don't have the things equal to the same

15    thing or equal to each other.

16         MR. ABRAMSON:  I agree with that, your Honor.

17         THE COURT:  I am not going to run that trial.  I am

18    not going to run a trial as to whether or not that which

19    Kaufman does is that which Kaufman taught.

20         MR. ABRAMSON:  So your concern is the prejudicial

21    effect.

22         THE COURT:  I am concerned about two things.  I am

23    concerned about the large expansion of trial time on an issue

24    that is not directly relevant, nor will it help the jury and it

25    will confuse the jury, so the element of prejudice comes in as

K1G8KAUC

1     well.  Because we are not focusing on what Kaufman does.

2              MR. ABRAMSON:  Understood, your Honor.

3              Can I confer with my client for one minute?

4              THE COURT:  Yes.

5              Let's take ten minutes.

6              (Recess)

7              THE COURT:  Yes, Mr. Abramson.

8              MR. ABRAMSON:  Yes, your Honor.

9              So our intent with that demonstration would be to

10    animate -- since the jury is not going to understand computer

11    code, which is a couple of hundred pages of the patent --

12             THE COURT:  We are dealing with claims, not computer

13    code.

14             MR. ABRAMSON:  I understand.  If your Honor believes

15    that would be inappropriate, then that's your Honor's ruling.

16             THE COURT:  I am interested in what you are going to

17    use it for.

18             I have this little book called Anatomy of a Patent

19    Case, prepared by the Complex Litigation Committee of the

20    American College of Trial Lawyers, published by the Federal

21    Judicial Center 2009.  On page 103, there is the following

22    discussion:

23             "Under some circumstances, courts have granted motions

24    to preclude evidence of the patentee's embodiment of the

25    invention.  Comparing the accused products to the patentee's

K1G8KAUC

embodiment of the invention is contrary to long-standing

principles of patent law.  Specifications teach.  Claims claim.

Infringement, literal or by equivalence, is determined by

comparing an accused product not with a preferred embodiment

described in the specification, or with a commercialized

embodiment of the patentee, but with properly and previously

construed claims in suit."

        MR. ABRAMSON:  I would say that's an accurate

statement.  Our purpose of doing this would not be to prove our

case by comparing Dynamic Data against this demonstration, but

rather, it's a demonstrative to show how the technology works.

        THE COURT:  I think that's got to be done a different

way, and I am not going to allow embodiment by your

commercialized product.

        MR. ABRAMSON:  Understood, your Honor.

        THE COURT:  That moots what you have to say, right,

Ms. Edelman?

        MS. EDELMAN:  Yes, your Honor.

        I would mention, your Honor, I believe it also would

moot our discussion regarding Microsoft's MIL number 1.  This

discussion that we are having now would moot our discussion

regarding the first motion in limine, Microsoft's first motion

in limine.

        THE COURT:  OK.  Willfulness.  Who is going to argue

willfulness?

K1G8KAUC

1          MR. DAVIS:  It will be Ms. Hardin-Smith.

2          MR. ABRAMSON:  And Mr. Jaffess for us.

3          MS. HARDIN-SMITH:  Good afternoon, your Honor.

4          THE COURT:  Good afternoon, Ms. Hardin-Smith.

5          Have you signed in?

6          MS. HARDIN-SMITH:  I believe so.

7          THE COURT:  I know you from before.

8          MS. HARDIN-SMITH:  I apologize, your Honor.

9          THE COURT:  Go ahead.

10          MS. HARDIN-SMITH:  So I am arguing Microsoft's motion

11  for partial summary judgment of no willfulness.  At the outset,

12  we would like to point out that this is Mr. Kaufman's burden to

13  prove willful infringement, and there is no record evidence at

14  all that Microsoft even had knowledge of Mr. Kaufman's '981

15  patent, let alone willfully infringed it before the filing of

16  this lawsuit.

17          One thing we want to point out is it's an essential

18  element of willful infringement that the alleged infringer have

19  knowledge of the patent-in-suit.  There is absolutely no

20  evidence of that here, and, notably, Mr. Kaufman's brief, in

21  response to this summary judgment motion, is silent on this

22  point.  There is no case law, they have cited no case law to

23  dispute the fact that knowledge of the patent-in-suit is an

24  essential element of willful infringement.

25          As your Honor, I believe, started to mention, Mr.

K1G8KAUC

1    Kaufman has pointed to a number of citations to Mr. Kaufman's

2    patent publications and tries to link that to knowledge of the

3    patent-in-suit.  However, there is a sharp distinction between

4    a patent application, and a publication of a patent

5    application, and the actual patent-in-suit.  All of the

6    citations that Mr. Kaufman has pointed to in Microsoft's patent

7    applications all are to patent publications of the '981 patent

8    application, or in the '981 patent family, but none of them are

9    to the patent-in-suit.  And knowledge is an essential element

10   of willful infringement.  If there is absence of knowledge on

11   the record, that is warranted to grant summary judgment of no

12   willfulness.

13          MR. JAFFESS:  Good afternoon, your Honor.  Ari Jaffess

14   on behalf of the plaintiff.

15          As a matter of law, it would be improper to find a

16   lack of knowledge.  There is sufficient evidence for a jury

17   here to find knowledge of Mr. Kaufman's --

18          THE COURT:  Where is the knowledge?

19          MR. JAFFESS:  If you could look at our opposition

20   brief.

21          THE COURT:  One minute.

22          What is the ECF number?

23          MR. JAFFESS:  126, ECF page 25.

24          THE COURT:  What page?

25          MR. JAFFESS:  ECF 25.  At the bottom it's page 21 of

K1G8KAUC

1    our brief.  This is the timeline.

2              THE COURT:  Page 21 of your brief?

3              MR. JAFFESS:  Yes.  ECF page 25 out of 30.

4              This is the timeline with the citations, your Honor.

5              THE COURT:  What is the paragraph number?

6              MR. JAFFESS:  There is no paragraph numbering.

7              THE COURT:  What is the pagination?

8              MR. JAFFESS:  The pagination is at the bottom right,

9    which is our pagination.

10             THE COURT:  Yes.

11             MR. JAFFESS:  21.

12             THE COURT:  We are on 21.

13             MR. JAFFESS:  At the top of the page, just the

14   timeline, it shows all of the citations.  These are actually

15   the key citations.  There is more than this.

16             THE COURT:  Just tell me here, what shows that

17   Microsoft knew about your patent?

18             MR. JAFFESS:  So this shows that Microsoft patent

19   applications had Mr. Kaufman's patent publications cited

20   against them.  And not just in an offhand manner.  They were

21   directly cited and compared with, and the Microsoft

22   applications were rejected over Mr. Kaufman's disclosures.

23             THE COURT:  The top of the blue line or below it?

24             MR. JAFFESS:  The ones below, the citations are below.

25             THE COURT:  So applications by Microsoft are

K1G8KAUC

1      mentioned.  The patent issued when?

2                  MR. JAFFESS:  In 2011, February 8.

3                  THE COURT:  So before that the application was not

4      published.

5                  MR. JAFFESS:  The application was published, the

6      claims were not issued.  But the claims were pending in the

7      family, the claims --

8                  THE COURT:  Does Microsoft have an obligation to

9      refrain from practicing that which is in the application if it

10     believes that the application is not valid?

11                 MR. JAFFESS:  Once it's issued, they absolutely do.

12                 THE COURT:  So it's when it's issued?

13                 MR. JAFFESS:  Yes.

14                 THE COURT:  We are looking only then at items 3 in

15     green.

16                 MR. JAFFESS:  Well, the knowledge doesn't go away once

17     it issues.  They have knowledge of the family, of its pendency,

18     their sophisticated actor.  These aren't random, offhand

19     citations.

20                 THE COURT:  Let me ask you again.  Supposing you know

21     that there is an application for a patent pending and you in

22     good faith believe that that application is not valid, are you

23     obligated to refrain from practicing what ultimately becomes an

24     infringement?

25                 MR. JAFFESS:  Before it becomes an infringement,

1    before it issues?

2              THE COURT:  Before it issues.

3              MR. JAFFESS:  We have no evidence of their good-faith

4    belief or any belief because they have shielded it with

5    privilege, as is their right.  But there is an absence of that

6    information.  What we know is that Microsoft was aware of this

7    patent family --

8              THE COURT:  What do you mean a patent family?

9              MR. JAFFESS:  So there are multiple patents that get

10   applied for with the same disclosure.  Their claims can differ.

11             THE COURT:  So that just shows confusion; it doesn't

12   show knowledge.

13             MR. JAFFESS:  It does not directly show knowledge, but

14   it circumstantially shows knowledge.  And some of the people

15   involved --

16             THE COURT:  You want me to rule -- you don't want me

17   to rule.

18             MR. JAFFESS:  No, I don't.  As a matter of law, you

19   can't rule that there is no knowledge.

20             THE COURT:  So let me ask Ms. Hardin-Smith.  What is

21   the legal effect of matters related to the patent in question

22   when the patent issues?

23             MS. HARDIN-SMITH:  As to willful infringement, your

24   Honor, none.  The essential element is it has to be knowledge

25   of the patent-in-suit.  It cannot be knowledge of the patent

K1G8KAUC

1    family, it cannot be knowledge of the patent publications

2    related to the patent-in-suit.

3           THE COURT:  Well, the patent comes out February 8,

4    2011, and Microsoft continues to infringe, for the sake of our

5    discussion here.  If there is no infringement, there is no

6    willfulness.  So we are only dealing with this subject on the

7    assumption that what you did was infringing and on the

8    assumption that the patent is valid.  So given those

9    assumptions, if you knew the patent -- and you are charged with

10   knowledge on February 8, 2011, are you not?

11          MS. HARDIN-SMITH:  Absolutely.  As of February 8,

12   2011, we are charged with knowledge of the patent-in-suit.

13          What you will notice in the timeline that Mr. Jaffess

14   has referred you to, the numbers 3 and 4, the patent

15   application citations, those are not to the patent-in-suit;

16   those are to patent applications, published applications

17   related to the '981 patent application.

18          THE COURT:  Where do you see 3 and 4?

19          MS. HARDIN-SMITH:  It's on the same page that Mr.

20   Jaffess referred you to on page 21.

21          THE COURT:  I am looking at the timeline on top of the

22   page.

23          MS. HARDIN-SMITH:  I'm sorry?

24          THE COURT:  I am looking at the timeline at the top of

25   the page.

K1G8KAUC

1          MS. HARDIN-SMITH:  That's correct.  If you see numbers

2     3 and 4 -- I'm sorry, number 3 in green on the bottom of the

3     timeline.

4          THE COURT:  There are two green numbers 3.

5          MS. HARDIN-SMITH:  That's correct.  And although those

6     fall after the patent issued, those particular citations do not

7     cite to the patent-in-suit, your Honor; they cite to patent

8     application publications related to the '981.

9          THE COURT:  Wouldn't you say this is an issue of fact?

10          MS. HARDIN-SMITH:  No, your Honor.

11          THE COURT:  Maybe I should add this.  If there is an

12     issue of willfulness, it will not be put to the jury and not be

13     tried until after a finding of infringement.  Wouldn't it be

14     better for me, and for you, for me to deny your motion at this

15     point in time and if it comes up, it comes up after a finding

16     of infringement?

17          MS. HARDIN-SMITH:  No, it would not be better, in our

18     opinion, because it will add extra time that is unnecessary to

19     the case.  Because at the outset, there is no factual dispute

20     here.  Although Mr. Kaufman is pointing to a patent

21     publication --

22          THE COURT:  I think Mr. Davis is anxious to have a

23     word with you.

24          MR. DAVIS:  Actually, your Honor, respectfully, I

25     wanted to have a word with your Honor.  I just want to make

K1G8KAUC

1     sure, if your Honor is --

2                THE COURT:  No.  We have got Ms. Hardin-Smith and she

3     is quite capable.

4                MR. DAVIS:  Absolutely.

5                MS. HARDIN-SMITH:  So just a quick follow-up to what

6     you're stating regarding willful infringement.  Our question is

7     if you would like to bifurcate the case, so that in that sense

8     there would be no evidence of willful infringement in the

9     initial phrase.

10               THE COURT:  Absolutely not.

11               MS. HARDIN-SMITH:  OK.

12               So where we left off, there is no issue, there is no

13    genuine issue of fact here.

14               THE COURT:  I should tell you this because we will get

15    to it later.  My thought is to have three phases to this trial.

16    Number one is validity and infringement, or infringement and

17    validity.  I am not sure what the sequence will be.  Number two

18    is damages.  Number three is willfulness.  So there will be no

19    proof of damages in the first section.  There will be no proof

20    of willfulness in sections one and two.

21               MS. HARDIN-SMITH:  Understood, your Honor.

22               So we still believe that willfulness can be resolved

23    now because there is no triable issue of fact.

24               THE COURT:  It's a little confusing to me here.  If

25    the references in December of 2006 and December of 2009 to

K1G8KAUC

1    Kaufman advised Microsoft of the nature of the patent that is

2    ultimately issued on February 8, 2011, I get confused because

3    that seems to suggest that the patent doesn't do anything

4    except enlarge the time span of the earlier patent, which would

5    be a patent abuse.

6           MS. HARDIN-SMITH:  Your Honor, there is one patent

7    here that is issued, and that was on February 8, 2011.

8           THE COURT:  The '981 patent.

9           MS. HARDIN-SMITH:  Correct.

10          THE COURT:  I will ask this to Mr. Jaffess.  If the

11   references in December 2006 and 2009 sufficiently advised

12   Microsoft of your patent, how can the patent office issue still

13   another patent, the '981 patent, in February 2011?

14          MR. JAFFESS:  Those were pending patent applications

15   that had claims that were different but similar to those that

16   ultimately did issue.  But those are publications, those are

17   not themselves patents.

18          THE COURT:  How can that advise anybody of anything?

19          MR. JAFFESS:  The people involved in those patent

20   applications, at least one of them, were actually involved in

21   the Dynamic Data product, the Microsoft folks.

22          The Microsoft application that was rejected was

23   actually called "Automatically Generating Web Forms from

24   Database Schema."

25          THE COURT:  They were rejected.

K1G8KAUC

1          MR. JAFFESS:  Yes.  Microsoft had an application with

2     that title that was rejected over Mr. Kaufman's pending patent

3     application, and some of the people that were involved were

4     also involved in Dynamic Data.

5          THE COURT:  I don't see where there is proof that

6     Microsoft knew of your patent.

7          MR. JAFFESS:  Proof is not required, direct proof.  It

8     is sufficient proof for a jury to reasonably find that they

9     were on notice, and the sum total of all of this evidence, your

10    Honor, is sufficient.

11         MS. HARDIN-SMITH:  Your Honor, if I may add a few

12    points.  One, Mr. Kaufman was aware as early as 2011 of the

13    potential that Mr. Microsoft might have infringed his patent

14    and never notified Microsoft.

15         THE COURT:  I am aware of it.

16         MS. HARDIN-SMITH:  This is in Mr. Kaufman's deposition

17    testimony.

18         THE COURT:  I am aware of that.

19         MS. HARDIN-SMITH:  So he at no point chose to notify

20    Microsoft.

21         THE COURT:  Another way of setting up a willfulness is

22    by giving specific notice, Hey, you're infringing my patent,

23    cease and desist.

24         MR. JAFFESS:  Your Honor, there was notice provided at

25    the filing of suit, and there is also the concept of post-suit

K1G8KAUC

willfulness.  In light of the clear allegations in this

litigation, Microsoft continued to leave Dynamic Data on offer

to the public.

THE COURT:  Supposing there is an good-faith belief

that your patent stinks?

MR. JAFFESS:  We have no knowledge of that because --

THE COURT:  They have responded to your lawsuit by

answering it and alleging defenses.

MR. JAFFESS:  That's an issue of fact, your Honor, the

reasonableness of that belief and what belief that was.

THE COURT:  What you want to do is punish Microsoft

for defending against your lawsuit.

MR. JAFFESS:  It's for continuing to leave it on offer

after the lawsuit was filed when infringement and validity were

clear.  And there is case law that we cited regarding the

reasonableness of such defenses and that they are not a defense

to willfulness, your Honor.

MS. HARDIN-SMITH:  Your Honor, if I may also add, Mr.

Kaufman's allegations of post-suit willful infringement should

be waived as untimely.  At no point did Mr. Kaufman notify

Microsoft of its allegation of post-suit willful infringement

until --

THE COURT:  His lawsuit.  He had his notification

there.

In your brief -- do you know the ECF number?

K1G8KAUC

1           MS. HARDIN-SMITH:  What are you referencing, your

2    Honor.

3           THE COURT:  I am asking Mr. Jaffess.  He says there

4    are cases that say that post-filing infringement would be the

5    basis for willfulness.

6           MR. JAFFESS:  Yes, your Honor.  22 to 23 of our brief.

7           THE COURT:  143, right?  Your brief is 143?

8           MR. JAFFESS:  126, your Honor.

9           THE COURT:  I decline to follow the two cases you

10   cite, one in the District Court of Delaware and the other in

11   the Eastern District of Texas.  It seems to me that if you have

12   a good-faith belief in your defenses, that you should be able

13   to litigate the lawsuit.  Willfulness in that context is a

14   stratagem to double the scope of your damage and obtain other

15   kinds of relief that are normally unavailable to a patent case.

16   So I grant the motion with regard to striking willfulness.

17           MS. HARDIN-SMITH:  Thank you, your Honor.

18           MR. JAFFESS:  Your Honor, for clarity, you were

19   talking about post.  You are granting the motion as to pre as

20   well?

21           THE COURT:  You have not given notice.  There is

22   nothing in the record to show that they had knowledge of your

23   patent and knowledge of their infringement, and you have to

24   show actual knowledge.

25           MR. JAFFESS:  Your Honor, if I might, on the timeline

K1G8KAUC

1   once more.

2           THE COURT:  Yes.

3           MR. JAFFESS:  There's citations in late 2011 and 2014.

4           THE COURT:  Let me pick it up again.

5           MR. JAFFESS:  Just two points.  These citations were

6   after the patent issued.

7           MS. HARDIN-SMITH:  I might add they are two patent

8   publications.  Those are the citations.  They are not citations

9   to the patent-in-suit.

10          MR. JAFFESS:  I would also add --

11          THE COURT:  These are items 3 you're talking about,

12  right?

13          MR. JAFFESS:  It's at the bottom towards the right, in

14  late 2011, November 29, 2011, and October 8, 2014.

15          THE COURT:  There is a green number 3.

16          So what is cited against Microsoft?

17          MR. JAFFESS:  I believe it was the publication of the

18  ultimately issued patent which had already issued.

19          THE COURT:  You believe or was it?

20          MR. JAFFESS:  I would have to double-check, your

21  Honor.

22          THE COURT:  If it's not a citation to the patent

23  itself, then it doesn't show actual knowledge.

24          MR. JAFFESS:  Because of privilege there wouldn't be

25  actual knowledge here, your Honor.  They have provided a

K1G8KAUC

1    privilege log, which we have provided to your Honor, where

2    these citations were discussed.

3         THE COURT:  That means they can't use it, but you

4    can't use it either.

5         Answer my question.  If the patent were a bar to their

6    application, it would have been cited.  But the citation was

7    not to their patent, it was to an application.

8         MR. JAFFESS:  Your Honor, if I might.  It's the same

9    patent and patent examiners don't always cite the most recent

10   item in a patent family.  To them, it's not a concern about the

11   patents, it's a concern about the disclosure.  But when someone

12   looks at it on the flip side, when it's been cited to them,

13   it's very clear it has been issued.

14        THE COURT:  You have to show me the language of that

15   citation that would cause me to believe that there is a proof

16   of actual knowledge.

17        MR. JAFFESS:  If I could have a few minutes.

18        THE COURT:  You can have it.

19        (Pause)

20        THE COURT:  It's obviously not in the record of this

21   motion, right?

22        MR. JAFFESS:  The fact that it was cited is in the

23   record, your Honor.

24        THE COURT:  The fact of the citation is in the record,

25   but the citation itself and the knowledge that would arise from

K1G8KAUC

1    it is not.

2              MR. JAFFESS:  Understood, your Honor.

3              THE COURT:  The motion of defendant's to strike the

4    claim of willfulness, to dismiss it, is granted.

5              We need to now go into the next phase.

6              Let's do the motions in limine I guess.

7              MR. ABRAMSON:  Yes, your Honor.  That's correct.

8              THE COURT:  Kaufman motion number 1 moves to exclude

9    reference to or arguments advanced in the inter partes review

10   proceedings in the patent office.

11             Now, admission by the party is relevant.  The fact of

12   the proceedings, or the location of the admission, is not

13   relevant.

14             Now, having had those rulings, what is left for me to

15   deal with, Mr. Abramson?

16             MR. ABRAMSON:  Nothing, your Honor.  I think that's

17   sufficient.

18             THE COURT:  Mr. Davis.

19             MR. DAVIS:  Ms. Edelman.

20             MS. EDELMAN:  Your Honor, that would also resolve

21   Microsoft's motion in limine number 4.

22             THE COURT:  So we have dealt with that.

23             Kaufman motion number 2 moves to exclude Microsoft's

24   expert from testifying about claim construction.

25             What is the relevance of that, Ms. Edelman?

K1G8KAUC

```
1           Who is doing this?

2           MR. ABRAMSON:  Which motion in limine?

3           THE COURT:  Kaufman motion number 2, moving to exclude

4   Microsoft's expert to testify about claim construction.

5           MR. ABRAMSON:  The issue here is that the expert

6   submitted a report, gave deposition testimony.

7           THE COURT:  I asked Mr. Jaffess to respond.  What is

8   the relevance?

9           MR. JAFFESS:  Sorry.

10          THE COURT:  I have got the wrong guy.

11          Mr. Wolff.

12          MR. WOLFF:  Microsoft has no intention of having its

13  expert testify about claim construction other than to just use

14  the constructions that were provided by the Court.  There are

15  certain terms in the claims that have not been resolved by the

16  Court.  You addressed two of those.

17          THE COURT:  There is not going to be an expert

18  testifying about that, I don't think.

19          MR. WOLFF:  It should apply to both sides.  No expert

20  should be testifying about claim construction.  Mr. McGoveran

21  in his report provides a foundational basis for his opinions,

22  and that is what they are complaining about.

23          THE COURT:  The proposition is neither side can have

24  an expert testifying about claim construction.

25          MR. WOLFF:  Correct.
```

K1G8KAUC

1              THE COURT:  Are you satisfied with that, Mr. Abramson?

2              MR. ABRAMSON:  Yes, I am, your Honor.

3              THE COURT:  Then that's done.

4              Kaufman motion number 3, to cure prejudice from

5    Microsoft's alleged spoliation of usage data, Kaufman seeks to

6    preclude Microsoft from introducing certain evidence and

7    arguments regarding usage data.

8              I need some help on this motion.  Remind me about the

9    spoliation.

10             MR. ABRAMSON:  Mr. Patchen will address that, your

11   Honor.

12             THE COURT:  Go ahead.

13             MR. PATCHEN:  Good afternoon.  Alex Patchen on behalf

14   of plaintiff.

15             So in this case we have asked Microsoft to produce

16   documents or to determine ultimately how many users of Dynamic

17   Data were there?  We have gotten consistently differing stories

18   from Microsoft.  First they provided data from 2017 forward,

19   says there wasn't any.  Then during the deposition of their

20   30(b)(6) witness on this, it turns out that there was data that

21   went further back that they had not obtained.  And that

22   information was actually removed after this litigation was

23   filed and a litigation hold should have been put in place.

24             THE COURT:  Just a minute.  In an answer to an

25   interrogatory, Microsoft answered it had no customers.  But in

K1G8KAUC

1     a 30(b)(6) deposition, what did you learn?

2               MR. PATCHEN:  In answer to its interrogatory, it said

3     it had some telemetry data.

4               THE COURT:  What kind of data?

5               MR. PATCHEN:  Telemetry, which is data that shows how

6     many people created a Dynamic Data project on a two-day basis.

7               THE COURT:  What is telemetry?

8               MR. PATCHEN:  It's recording.  So the way this worked

9     is any time there was a user who opened or created a Dynamic

10    Data project in a one-month period twice --

11              THE COURT:  So it has telemetry data of use.

12              MR. PATCHEN:  Correct.  They provided limited

13    telemetry data from middle of 2017 to 2018.  When we had asked

14    for further data going back further in time, we were told that

15    they had deleted the data for a number of reasons, including

16    because of GDPR.

17              THE COURT:  Because of what?

18              MR. PATCHEN:  European privacy protection rules that

19    went into place, GDPR.

20              THE COURT:  In other words, they were forced to delete

21    the information by operation of law.

22              MR. PATCHEN:  They didn't go that far.  They said they

23    wanted to be in compliance with the European privacy law.  The

24    telemetry data they produced was US-related user, so it doesn't

25    necessarily require -- they might not have been in violation of

K1G8KAUC

1    the law otherwise.

2              THE COURT:  They gave you information about US

3    telemetry users between 2017 and 2018 and not before.

4              MR. PATCHEN:  That's correct.

5              THE COURT:  And they gave you no information about

6    European use.

7              MR. PATCHEN:  That's correct.  We are not seeking

8    information as to European use because it's a US patent.

9              THE COURT:  And the documents showing the possibility

10   of usage data before 2017 were deleted.

11             MR. PATCHEN:  Correct.  And that was the testimony

12   from their 30(b)(6) witness.

13             THE COURT:  And the pretext was the European rule?

14             MR. PATCHEN:  He said that amongst other reasons.  He

15   didn't provide any further detail.

16             THE COURT:  What remedy do you want?

17             MR. PATCHEN:  We are seeking two remedies:  One, that

18   they can't now come in and try to provide usage data from an

19   earlier period of time; and two --

20             THE COURT:  Earlier period before 2017.

21             MR. PATCHEN:  That's correct.  And what we are talking

22   about is specifically telemetry information.  If they want to

23   use qualitative information to try to say that the usage was

24   low, we are not objecting to that.

25             THE COURT:  Did they give you that information?  Is

K1G8KAUC

1    that spoiliated?

2          MR. PATCHEN:  They ultimately pick and chose and found

3    some limited information as to some usage from 2011 using a

4    different system which they themselves, their witness called

5    completely random.  So that information should not be

6    presented.

7          The other relief we are seeking is because --

8          THE COURT:  I am still not clear what the first is.

9    You want them not to be able to prove any usage data.

10         MR. PATCHEN:  Not to be able to provide any form of

11   alternate usage data.

12         THE COURT:  What is alternate usage data?

13         MR. PATCHEN:  For example, the main telemetry

14   information was from the 2017 to '18 period.  Microsoft did

15   make efforts, when we raised this issue, to find whatever they

16   could find.  They were able to find some limited information

17   from a further back period of time from data called SQM data,

18   which is a different type of telemetry, through different

19   systems, which they themselves have said is unreliable.

20         THE COURT:  What is it you want me to do, rule that

21   they cannot use any data to show use and nonuse before 2017?

22         MR. PATCHEN:  That's the first part of the relief we

23   are seeking.

24         THE COURT:  What is the second part?

25         MR. PATCHEN:  The second is, in order for -- 2011 is

K1G8KAUC

1   when the patent issued.  That's the key date from a reasonable

2   royalty perspective.

3              THE COURT:  Can't you give me a succinct statement of

4   what remedy you want from me?

5              MR. PATCHEN:  The second relief is for them not to be

6   to challenge the methodology that our damage expert used to

7   estimate what the usage was in 2011.

8              THE COURT:  Why not?

9              MR. PATCHEN:  Because they should have retained data

10  going further back in time.  They told us from 2015 going

11  forward is when they had this newer system of data in place and

12  that they did not retain from 2015 through 2017.  So that would

13  have provided a longer range of data, which would have allowed

14  a more thorough view of the trends and usage.

15             THE COURT:  How much usage was there in 2017 to 2018?

16  It's two years, right?

17             MR. PATCHEN:  The usage was approximately 770 users a

18  month.  That's what our damage expert determined based on the

19  usage data, the two-day usage data that they provided.

20             THE COURT:  770 users per month.

21             MR. PATCHEN:  Correct.

22             THE COURT:  How much for the two-year period?

23             MR. PATCHEN:  The royalty calculation that our damage

24  expert used was based on a monthly usage, with a monthly

25  royalty, for calculation purposes.  So the 770 users per month

K1G8KAUC

times 12.

THE COURT:  What did your expert do, extrapolate them backwards and say it would be the same use between 2011 and 2017?

MR. PATCHEN:  No.  What he did was he extrapolated backwards to show that there was a significantly higher use in 2011.  And that was because, as even Microsoft has argued, the product was no longer being actively promoted and it was on a downward trend, so by the time you get to 2017 to '18 the use was significantly less.

THE COURT:  So 770 users per month was the end of a downward trend.

MR. PATCHEN:  Correct.

THE COURT:  How do you know that?

MR. PATCHEN:  We know that because what we did is we used something called Google Trends, and Google Trends shows the relative interest in time between 2011 and 2017.

THE COURT:  Google Trend?

MR. PATCHEN:  Google Trends, plural.

THE COURT:  What kind of method is that?

MR. PATCHEN:  It is a method that has been used in academic literature, and our damage expert testified to it and referenced it in his report, as to a way to show relative interest.  What Google Trends does, it says how many people were searching for a term, in this instance Dynamic Data, in

K1G8KAUC

2011?  How many people were searching for the same term from

2011 all the way through?  And Microsoft actually uses Google

Trends for other purposes.

THE COURT:  Let me get the position of Microsoft.

Mr. Davis.

MR. DAVIS:  Thank you, your Honor.  This is somewhat

of a difficult issue.  I want to try to cut through and start

off with some points that I think really aren't in dispute.  I

will go through in a little more detail what actually happened

with the documents, but the fundamental issue that really

suggests the motion should be denied is the following.

The way that Mr. Patchen just characterized the

searches that were done was a search for Dynamic Data.  As you

heard a little bit earlier from my colleague, Mr. Wolff, what

is actually at issue --

THE COURT:  Can I ask this question, Mr. Davis.  Was

there spoliation?

MR. DAVIS:  There's documents and information that was

lost.  Our position is it's not relevant to the issues in this

case.  And as soon as we were alerted to the fact that counsel

believed there was an issue, we took all the curative steps

that we could.  We put up our 30(b)(6) for another deposition.

We paid for counsel to fly back out to Seattle or Bellevue and

take an additional deposition.

THE COURT:  In the end was usage data provided?

K1G8KAUC

1      MR. DAVIS:  There is certainly usage data that was

2  provided from 2017 and on forward.

3      THE COURT:  The relevant period begins with the

4  patent, right?

5      MR. DAVIS:  It does.  And that is where I was going

6  initially.  The patent issued in 2011 and the damages experts

7  agree that the relevant time frame for the hypothetical

8  negotiation would have been around that time.  Because Mr.

9  Kaufman did not put Microsoft on notice of his patent, and

10  Microsoft first got its notice with the filing of this suit

11  in --

12      THE COURT:  Maybe I am just misunderstanding this.

13  His damage will be based on a hypothetical royalty rate from

14  2011 forward, but that would be the rate.  It would be

15  multiplied by the number of instances of infringement.  That

16  would be your use.  And so I ask you a simple question.  At any

17  time did Microsoft produce to the plaintiff evidence of all

18  use?  Did it give a full and complete answer to the

19  interrogatory how many times did you use the accused device?

20      MR. DAVIS:  I understand your Honor's question, and I

21  am going to try my best to answer it.

22      THE COURT:  Can you answer it directly, please?

23      MR. DAVIS:  Yes.  Microsoft gave the plaintiffs all of

24  the evidence that it had at the time that this issue arose.

25      THE COURT:  Isn't it required that you give all

K1G8KAUC

1    instances of use?

2         MR. DAVIS:  Can you repeat that?

3         THE COURT:  Shouldn't you be giving all instances of

4    use?

5         MR. DAVIS:  We certainly should be giving them all

6    instances of use.  But the issue is, your Honor, how we define

7    use.  The telemetry that counsel is referring to doesn't

8    actually identify use of the accused functionality, and that's

9    the point that I was attempting to make.

10        THE COURT:  We will postpone this until 2:15.  We will

11   continue.

12             (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

K1G7KAU2

AFTERNOON SESSION

2:15 p.m.

1      THE COURT:  Be seated, please.  Continue, Mr. Davis.

2      MR. DAVIS:  Thank you, your Honor.  I think the place

3  to start and to go back to was during the argument I heard

4  Mr. Patchen ask for a few remedies.  The first remedy he sought

5  was that Microsoft would not use any of the earlier telemetry

6  data in response in its case, and we can agree that we won't do

7  that.

8      THE COURT:  OK.

9      MR. DAVIS:  The second remedy that he sought was that

10  Microsoft not be allowed to effectively cross-examine their

11  damages expert on the Google Trends analysis that he performed,

12  and we believe that would be an inappropriate remedy.

13      THE COURT:  Appropriate or inappropriate?

14      MR. DAVIS:  Inappropriate.  That we should be

15  permitted to cross-examine their expert on the use of that

16  Google Trends data.

17      THE COURT:  How does he prove damages if there are no

18  records and you should have produced the records?

19      MR. DAVIS:  So, with your Honor's permission, I'd like

20  just a few minutes to frame the issue, because I think if the

21  Court will allow me to do so, I think we will answer that

22  question.

23      THE COURT:  I will ask Mr. Patchen to sit down.

K1G7KAU2

1          MR. DAVIS:  Thank you.  Microsoft over time, since the

2     relevant time that the patent issued, has had two telemetry

3     systems.  The first one that was in effect at the time that the

4     patent issued has been referred to by the parties as SQM.  That

5     was in effect when the patent issued.  It was in effect when

6     this lawsuit was filed in 2016.

7          Importantly for purposes of this motion, your Honor,

8     are two things:  First, in the ordinary course of Microsoft's

9     business that SQM data was rolled over such that it only went

10    back 18 months, and because Microsoft had not received prior

11    notice of this patent or the allegations of infringement until

12    the lawsuit was filed, even if the Court were to accept

13    everything that they have said as true and correct --

14          THE COURT:  What's the filing date?

15          MR. DAVIS:  Filing date of this lawsuit was April of

16    2016.

17          So even if this Court were to accept everything that

18    the plaintiffs have said is true, the data would have only gone

19    back 18 months earlier, because that is the first time

20    Microsoft received notice of these allegations and implemented

21    a litigation hold as soon as it had such knowledge.

22          More importantly, your Honor, is the fact that --

23          THE COURT:  October 2013.

24          MR. DAVIS:  I'm sorry?

25          THE COURT:  Well, from October 2013.  You would have

K1G7KAU2

1    had records up through --

2                    MR. DAVIS:  '14.

3                    THE COURT:  From October 2013 forward.

4                    MR. DAVIS:  '14.  Because the lawsuit was in April of

5    2016.

6                    THE COURT:  Correct, October 2014.

7                    MR. DAVIS:  So as your Honor aptly noted before we

8    took the lunch break, the hypothetical negotiation in this case

9    the experts agree would have taken place in approximately

10   February of 2011.  That data would not have existed in any

11   event within Microsoft because it only went back 18 months from

12   the time the lawsuit was filed.

13                    An additional problem that the plaintiffs have is that

14   the data that did exist in that SQM system --

15                    THE COURT:  Can I stop you?  The two aspects for a

16   royalty are rate and unit.  When you fix a rate at the

17   beginning of a patent period you don't have units, you just

18   have rate.  Units occur over time.

19                    So, what you have done is prevent the plaintiff from

20   proving units of damage between the date of the patent of

21   February 2011 and October 2014, roughly three and a half years.

22                    MR. DAVIS:  I disagree with that, and I would like to

23   explain to the Court why.

24                    THE COURT:  Is my arithmetic correct?

25                    MR. DAVIS:  Your arithmetic is correct, yes.  May I

K1G7KAU2

continue?

THE COURT:  Yes.

MR. DAVIS:  The reason why we disagree with what your Honor has said is because the data in the SQM system did not track usages of scaffolding in Dynamic Data, which is what Mr. Kaufman's expert has accused of infringement.

So, in other words, your Honor, even if the data did go back to 2011, it would not have shown usages of scaffolding in Dynamic Data.  What that data showed were the times that users opened the Dynamic Data application.  And I have an example that I think may be helpful.

THE COURT:  You're telling me that a subset of that would have been appropriate.

MR. DAVIS:  I'm not sure what your means by "would have been appropriate".

THE COURT:  Some of the usages -- if you think of gross and net --

MR. DAVIS:  Yes.

THE COURT:  -- the evidence you had was of gross, and from that gross you had to extrapolate a net.

MR. DAVIS:  I'm not sure I would go that far.  I think a better analogy is the following, your Honor:

If the patent claims were directed to the example of someone using their ATM card to check their balance, the data that Microsoft had was the number of times that the ATM card

K1G7KAU2

1    was inserted into the machine.  So, in other words, even if

2    Microsoft had had data back to 2011, they would not have been

3    able to divine from that information how many actual usages of

4    scaffolding were included within them.  So, for that reason the

5    data they would have gotten even if it existed would not have

6    been relevant, and their expert agrees with that.

7            There is one other --

8            THE COURT:  Well, it might not have been material but

9    it would have been relevant.

10           Of all of those insertions of an ATM card, some would

11   have been used for checking balances.

12           MR. DAVIS:  You're correct, some of them would have

13   been, and there would have been no way to decide.

14           THE COURT:  So if you take the insertions of the ATM

15   card as equivalent to gross, and the number of those that

16   checked balances as net, that would give you the net figure.

17   But you couldn't get to the net figure until you had the gross.

18           MR. DAVIS:  In that example your Honor is correct.

19           THE COURT:  So a certain number of those SQMs were

20   usages of what is alleged to be infringing.

21           MR. DAVIS:  That's correct.

22           THE COURT:  And we don't know what proportion.

23           MR. DAVIS:  That's correct.  And we would not have

24   known whether the data existed or not.

25           THE COURT:  So, what would have been the practical

K1G7KAU2

1    effect in the development of a royalty rate as of February

2    2011?  The task would have been made more difficult because the

3    unit of measurement was gross and not net.

4         One way that people have to deal with that is to apply

5    a lower percentage to the higher number of strikes of the SQM.

6    In any event, how many measurements there were of that SQM

7    would be relevant.  It may not be dispositive of a problem.  It

8    may not have been material in that sense, but it's relevant.

9    And Microsoft has eliminated the relevant evidence.  That comes

10   down to the spoliation.

11        MR. DAVIS:  I understand what your Honor has said.

12        THE COURT:  So the question is how to deal with that.

13        MR. DAVIS:  Right.

14        THE COURT:  And so one remedy they have is to take the

15   number -- and I didn't know what Google Trends reflected, but

16   as I understand it it's this:  They measure in some fashion the

17   number of times people inquire, use -- I don't understand --

18   inquire, I guess -- as to this allegedly infringing process.

19   And they know that number for a certain number of years, but

20   they don't know it for previous years.  So a graph is

21   constructed based on what is known to extrapolate back what was

22   potentially in existence.  That's what the expert wants to do.

23   I don't know whether you call it Google Trends or anything

24   else, but it's a statistical advice, in effect to draw a

25   parabolic effect.

K1G7KAU2

1          MR. DAVIS:  Your Honor, I understand and agree that

2     that is what their expert wants to do, and because we

3     understand that's what their expert wants to do, we did not

4     move to exclude or prevent him from doing that.  What

5     Mr. Patchen --

6          THE COURT:  What is it you want to do?

7          MR. DAVIS:  I want to be able to cross-examine him.

8     What Mr. Patchen asked for as his second proposed remedy is

9     that when their expert presents that testimony with respect to

10    Google Trends, that we not be allowed -- if I understand him

11    correctly -- that we not be allowed to challenge that use

12    because of this issue that they have raised.

13         THE COURT:  What would be the basis of

14    cross-examination?

15         MR. DAVIS:  The basis of cross-examination, among

16    other things, would be that the Google Trends data is

17    unreliable.  And the reason that we want to make that argument,

18    your Honor, as I said --

19         THE COURT:  In what respect?  The measurement of the

20    number of instances of inquiry?

21         MR. DAVIS:  Right.  Because the Google -- the

22    testimony and the evidence in this case is going to show, your

23    Honor, that what the Google Trends data showed was the number

24    of hits on a search term, to simplify --

25         So, for example, what I understand their expert to

K1G7KAU2

1 have done is to use Google Trends to determine how many people

2 did a search for the term Dynamic Data over, you know, a six or

3 seven year timeframe.

4     THE COURT:  I suppose of those who inquired, they

5 inquired to know so they could use, and some subset of that

6 perfected itself in actual use.

7     The problem we have here is that we are searching for

8 some equivalent to compensate for the destruction of

9 information.  Almost by definition that which is being proposed

10 to be used is less accurate than actual measurements, and the

11 dilemma for me is how I can have an appropriate remedy for the

12 plaintiff without unjustly penalizing the defendant.  So I have

13 to allow you to cross-examine, but I don't know what the end of

14 it is going to be.

15     MR. DAVIS:  If I may, your Honor.

16     THE COURT:  Because I don't feel I want to tell the

17 jury that the reason that the expert is doing this is because

18 the evidence that would be most relevant has been destroyed.

19     MR. DAVIS:  I appreciate that dilemma, your Honor.  I

20 guess I would make two points -- one point and perhaps one

21 suggestion.

22     The point is this:  Again, I think it's important to

23 keep this in mind.  Because the hypothetical negotiation was in

24 2011, they would have had to have done this anyway to get back

25 to that point.

K1G7KAU2

1          THE COURT:  No, they would have determined in 2011, if

2     the record that was being used was not sufficiently accurate,

3     either the rate would have been discounted to some degree or an

4     accurate measurement would have been inserted.

5          MR. DAVIS:  The issue, your Honor, is that when they

6     filed the lawsuit --

7          My only point in making that is that when they filed

8     the lawsuit, the data only went back to 2014 under the ordinary

9     course of Microsoft's business.  So, if this had never

10    happened, they still would have only had data back to 2014.  So

11    to get back to 2011, their expert would have needed to do the

12    same -- presumably would have done the same analysis that he

13    has done now.

14         THE COURT:  Would have created a graph the same way.

15         MR. DAVIS:  So that was the point that I wanted to

16    make.

17         THE COURT:  We would have a trend line.  There would

18    be a statistical expert to discuss a trend line.

19         MR. DAVIS:  So the related point there, your Honor --

20    and I understand we have raised this -- or this issue came up

21    before we learned today that your Honor was planning to

22    bifurcate the case -- I think this is an issue that doesn't

23    bear on validity or infringement at all.

24         THE COURT:  No, it doesn't, but I want to settle it

25    now, because my thought is that the jury would not be given a

K1G7KAU2

1    break.  As soon as it delivered a verdict on validity and

2    infringement, if it were a plaintiff's verdict, it would go on

3    to damages immediately.

4              MR. DAVIS:  I understand.

5              THE COURT:  So I have to give you a ruling now.

6              What expert do you have on rates, royalty rates?

7    Mr. Abramson?

8              MR. ABRAMSON:  What expert do we have?

9              THE COURT:  On royalty rates.

10             MR. ABRAMSON:  We have a damages expert Brian Dies.

11             THE COURT:  What is he going to say?

12             MR. ABRAMSON:  On the royalty rate he is going to talk

13   about a hypothetical negotiation.  He is going to talk about a

14   hypothetical negotiation in 2011 based on anticipated usage

15   from that date going forward.

16             THE COURT:  And is customarily royalty rate adjusted

17   if the usage is more or less than that which is projected?

18             MR. ABRAMSON:  It certainly enters into the

19   calculation, absolutely.

20             THE COURT:  Is there any way to stipulate to this

21   information?

22             MR. ABRAMSON:  To stipulate to which information?

23             THE COURT:  Well, that which we're talking about.  The

24   reasonable equivalent to that which Microsoft would have had.

25             MR. ABRAMSON:  I would expect there would be a

K1G7KAU2

1    substantial disagreement about that for the same reason that

2    they challenge our expert analysis.  I mean their report had in

3    it --

4            THE COURT:  Now, damages have to be proven as any

5    other proposition of fact has to be proven.

6            MR. ABRAMSON:  And we are prepared to do that.

7            THE COURT:  What Mr. Davis wants to do is to impeach

8    the accuracy of the information that you're using for damages,

9    not having you allowed to use more accurate information.

10           He would have had an argument in the beginning that

11   the information that exists is not sufficient, but that would

12   have been overcome.

13           I'm going to make this as sort of a tentative ruling,

14   that Mr. Davis can cross-examine the expert, but in so far as

15   the expert's testimony is impeached on the basis that it is not

16   sufficiently accurate, I'm going to have to figure out a way to

17   tell the jury that the more accurate information does not exist

18   because it had been destroyed by Microsoft.

19           MR. ABRAMSON:  Your Honor, we think that would be an

20   appropriate approach.

21           THE COURT:  I know you like that, Mr. Abramson.

22           MR. ABRAMSON:  Yeah.  And I think that the rules --

23           THE COURT:  I'm not really happy with it.

24           MR. ABRAMSON:  I think the rules --

25           THE COURT:  I'm not really happy with it.

K1G7KAU2

1          MR. ABRAMSON:  I understand, your Honor.  I think the

2     rules do contemplate such a remedy.  If you look at the

3     commentary to the Federal Rules on this topic -- is it Rule 37?

4     Rule 37.

5          THE COURT:  Is there any way for me to take damages as

6     a judge issue and not a jury issue?

7          MR. ABRAMSON:  If the parties agreed to it.

8          THE COURT:  Yeah, that's really my question.

9          MR. ABRAMSON:  I don't think we would -- I don't think

10    we would be inclined to agree to that.

11         THE COURT:  The rule also, Mr. Abramson, is that you

12    are entitled to royalties not for the entire process but only

13    for the part of the process that's infringed.

14         So, a royalty rate that might be available for the

15    entire process would not be the same; it would be larger than

16    the royalty rate for the part of it that is the invention.

17         MR. ABRAMSON:  Well, your Honor, our expert factored

18    that into his analysis very consciously, of course.  You're

19    only going to get entitled to remuneration for the value of the

20    technology that's in their actual infringement.  That's

21    understood, and that was taken into -- that was taken into

22    account in his report.

23         I think, you know, Mr. Davis also had some arguments

24    here about what does and what doesn't infringe, and I think we

25    would disagree with some of that.  It's not so clear that some

K1G7KAU2

1     of those downloads would not necessarily have infringed.  There

2     are issues there of fact there as well.  It's not as --

3               THE COURT:  I'm going to resolve this now.  I don't

4     think I'm getting more light on the subject.

5               I'm going to rule that -- and it's tentative -- that

6     Mr. Davis can cross-examine the expert to show the weaknesses

7     of the expert's analysis but -- as I believe the instruction to

8     the jury will be -- when that is the best available evidence

9     that can be taken as appropriate evidence to prove damages.  I

10    don't remember the exact terminology but it's something like

11    that.  And that's what I guess I will be charging.

12              OK, that motion is finished, it's granted, to the

13    extent I granted it and denied it to the other extent.

14              MR. ABRAMSON:  Thank you, your Honor.

15              MR. DAVIS:  Your Honor, if I may, there was a related

16    motion in limine that we had filed.  I think effectively your

17    Honor has ruled on that, but just for the record that was

18    Microsoft's motion in limine number 22, I believe.

19              THE COURT:  Let me go down in order.

20              So we finished with Kaufman's motions 1 through 3.

21    Microsoft's motion 1 moves to preclude Kaufman from arguing

22    that his Schemalive product practices the asserted claims.  I

23    have ruled on that.  That motion is granted.

24              Microsoft motion 2 moves to exclude mention of alleged

25    spoliation.  I'm going to reserve on that and rule at the end

K1G7KAU2

1    of the direct examination.

2                MR. DAVIS:  Your Honor, with respect to reserving in

3    direct examination, you mean the direct examination of the

4    damages expert?

5                THE COURT:  Yes.

6                MR. DAVIS:  Right.  So as it relates to the liability

7    phase of the trial --

8                THE COURT:  -- there won't be damages.  We're not

9    getting into that.

10                MR. DAVIS:  Thank you.

11                THE COURT:  Microsoft motion 3 moves to exclude

12    evidence of Microsoft's knowledge of prior Kaufman

13    publications.  That's the willful infringement claim.

14                MR. DAVIS:  Correct.

15                THE COURT:  And I've ruled on that, so the motion is

16    granted.

17                It's not relevant to anything about infringement or

18    validity.

19                Microsoft motion 4 moves to exclude reference to the

20    outcome of the inter partes review.  That's granted.

21                All right.  I think that deals with all the in

22    limines.  Give me a moment to reorganize.

23                Going to the pretrial order.  Let's talk first about a

24    number of generalities.

25                The first phase will be validity and infringement.

K1G7KAU2

1    Now, theoretically and analytically a plaintiff can prove his

2    case by resting on the presumption of validity and going

3    directly to infringement.  I suspect that's not your plan,

4    Mr. Abramson.

5              MR. ABRAMSON:  That's correct, your Honor.

6              THE COURT:  Tell us your plan.

7              MR. ABRAMSON:  I'm sorry?

8              THE COURT:  What is your plan?

9              MR. ABRAMSON:  We're going to proceed --

10             THE COURT:  You're going to go first.

11             MR. ABRAMSON:  We're going -- yes, I think our plan is

12   that we have a presumption of validity, absolutely, and then

13   we're going to proceed with ownership of the patent and the

14   fact that Microsoft --

15             THE COURT:  That's not challenged, is it?

16             MR. ABRAMSON:  Pardon me?

17             THE COURT:  Ownership is not challenged.

18             MR. ABRAMSON:  Ownership is not challenged.  We're

19   going to proceed with proof of infringement.

20             THE COURT:  Well, are you going to have Mr. Kaufman as

21   your first witness?

22             MR. ABRAMSON:  Yes, Mr. Kaufman will be the first

23   witness.

24             THE COURT:  So, what is he going to talk about?  Is he

25   going to talk about issues of validity also, about what the

K1G7KAU2

1    prior art was and how he thought his invention was something --

2              MR. ABRAMSON:  Yes, as background.  We will save for

3    cross-examination and rebuttal such evidence as is submitted by

4    the defendant, to try to establish the defense of invalidity.

5    So, that's how we would handle that.  So, Mr. Kaufman would

6    review the prior art in his efforts and development as

7    background for what his invention was, how it was done.

8              THE COURT:  He would not be testifying as to the

9    issues of infringement.

10             MR. ABRAMSON:  Sorry?

11             THE COURT:  He would not be testifying in any way

12   evaluating what the defendant did.

13             MR. ABRAMSON:  He is not going to express opinions on

14   it.  He is going to present it.  He is going to present the

15   factual -- he is going to present the factual basis upon which

16   the expert, Professor Shasha, will address -- Professor Shasha

17   will be the one who compares the features of the claims against

18   the accused.

19             THE COURT:  So essentially you have two witnesses.

20             MR. ABRAMSON:  Yes.  And the coinventor, Micah

21   Silverman, will also appear briefly to explain his role.

22             THE COURT:  OK.

23             MR. ABRAMSON:  And then after that our expert will go

24   through the infringement analysis and also some foundation.

25   Well, I guess foundation as to damages is out now.

K1G7KAU2

1          THE COURT:  So, Mr. Davis, having heard this so far,

2     any comments?

3          MR. DAVIS:  I do, your Honor.  That's just the concern

4     about Mr. Kaufman offering what sounds like expert -- what is

5     going to run right up to the line -- if not cross the line --

6     for expert testimony.

7          THE COURT:  You will be objecting, won't you?

8          MR. DAVIS:  Yes, I will.

9          THE COURT:  Well, I can rule on it at that time, but

10    he is not here as an expert.

11         Incidentally, I will just break in.  Objections are

12    made by standing and saying "objection".  There is no

13    explanation of objections.  Unless I ask for it -- and I will

14    ask for it -- if I do -- generally at a side bar.  You can ask

15    for side bars, but it's not likely I will be giving them.  If I

16    understand the issue, I will rule, and we will keep on going

17    with the trial.  I think side bars are very disruptive to a

18    jury and I try to minimize their use.

19         MR. DAVIS:  Can I ask for clarification, your Honor?

20    For issues that we might want to just get our objection on the

21    record preserved, but to make sure that we are sticking to your

22    Honor's rules, would your preference be that the first time

23    that we are outside of the presence of the jury we just state

24    that on the record?

25         THE COURT:  No, just say "objection".  You don't need

K1G7KAU2

1    to do anything more.  You're strongest, if there is an

2    appellate issue, if you just say objection and I make a

3    mistake.

4              MR. DAVIS:  OK, I understand.  The only reason I ask

5    that question, I'm not quite sure what your Honor is aware of

6    the basis of the objection.

7              THE COURT:  Generally I can figure it out.

8              MR. DAVIS:  I mean if the objection is it's beyond the

9    scope of the report, for example, your Honor might not be

10   immediately aware of that.

11             THE COURT:  Well, I will figure it out.

12             MR. DAVIS:  Thank you.

13             THE COURT:  All right.  Then it will be Mr. Davis'

14   turn, and you will be proving -- you will be denying

15   infringement, and you will be starting to prove the issues of

16   validity.

17             MR. DAVIS:  That's correct.

18             THE COURT:  Invalidity.

19             MR. DAVIS:  That's correct.

20             THE COURT:  And then I guess there will be rebuttal if

21   necessary.

22             MR. ABRAMSON:  Yes.

23             THE COURT:  I am a little confused in terms of what

24   kind of scope there will be on the rebuttal case with regard to

25   validity.

K1G7KAU2

1          MR. ABRAMSON:  I think there could be considerable

2     rebuttal.

3          THE COURT:  So, if there is considerable rebuttal,

4     I've got to give Mr. Davis additional time at the end to in

5     effect finish up and do a reply.

6          Now, you have given me a time.  Are you comfortable

7     with the time that you've given me?

8          MR. ABRAMSON:  You mean number of hours?

9          THE COURT:  Yes.

10         MR. ABRAMSON:  It might be a little tight.  It might

11    be a little tight, because if those hours cover both the

12    liability and damages phase, it could be a little tight.  But I

13    think --

14         THE COURT:  Then suppose we limit it to liability and

15    infringement.

16         MR. ABRAMSON:  Pardon me?

17         THE COURT:  We limit the time estimates --

18         MR. ABRAMSON:  Then I think that's adequate.

19         THE COURT:  -- to the issues of the first phase of the

20    trial, liability and infringement -- validity and infringement.

21         MR. ABRAMSON:  I think 16 hours is adequate.

22         THE COURT:  And that starts with the opening and goes

23    right through the closing.

24         MR. ABRAMSON:  Yes, per side.

25         MR. DAVIS:  Your Honor, obviously if that is the

K1G7KAU2

1    Court's order, we will abide by that.  We actually agreed to 16

2    hours expecting that that would be both liability and damages.

3    We think it's more than that.

4                THE COURT:  I'm likely to give you both a little more

5    time because I think it's going to be difficult getting the

6    jury to understand this patent.

7                That was the next question.  How will you educate the

8    jury with regard to the patent?

9                MR. ABRAMSON:  Well, Mr. Kaufman gave the tutorial

10   here at the outset, and I think he is very capable of doing

11   that.

12               THE COURT:  He can do that in his proof by asking him

13   questions and having him answer?

14               MR. ABRAMSON:  Yes, because it's relevant to how he

15   came up with this invention, how he implemented it.

16               THE COURT:  The jury has to measure infringement

17   against the claims, so it's necessary for the jury to

18   understand not only the overall concept and not only what he

19   had in mind in relationship to what he thought was an invention

20   but also with respect to the specific claims.  And he cannot

21   give a tutorial.  He is a witness.  He is a fact witness, and

22   that steps out of his role as a fact witness.

23               You have to give the tutorial.

24               MR. ABRAMSON:  I'm perfectly giving the tutorial, your

25   Honor.  I mean I can, and I am happy to do it.

K1G7KAU2

1          THE COURT:  Why don't you as part of your opening --

2    or, better still, we will count this -- yes, it's part of your

3    opening.

4          Show the patent to the jury, take the jury through the

5    patent, explain it, go through the terms, go through the

6    Markman definitions.  And then in his opening Mr. Davis will

7    counter that to whatever extent he thinks appropriate.

8          Mind you, objections are appropriate during openings.

9    I know some judges take a dim view of objections during opening

10   and summations.  I do not.  If you have an objection, make

11   them.

12          Is that satisfactory, Mr. Davis?

13          MR. DAVIS:  My expectation was that the ordinary

14   course of things would be that their expert would do that.

15   Yes, it's satisfactory provided that we're not going to have

16   Professor Shasha get up a day later or a day and a half later

17   and just completely redo everything that Mr. --

18          THE COURT:  No, it won't be appropriate for him to

19   repeat.

20          MR. ABRAMSON:  He will not, your Honor.

21          THE COURT:  The patent is Exhibit 1 in evidence in

22   effect, and we start from that.  And when you're putting in an

23   exhibit, you can show the exhibit to the jury and take them

24   through it.  And I would like you to do that, Mr. Abramson, so

25   the jury understands.

K1G7KAU2

1          MR. ABRAMSON:  OK.

2          THE COURT:  This is a great challenge for me.  It's

3     the first patent case that I've tried, and I don't think there

4     has been much experience in the court with patent cases tried

5     to a jury.

6          I have a very strong belief that the jury can and must

7     understand everything that goes into the trial.  It's my job to

8     make sure that that happens, and I'm delegating that

9     responsibility to both of you so the jury understands what it

10    is we're talking about.

11         I do not want the jury to make rulings on the basis of

12    some ill-conceived and ambiguous notion of what a patent is or

13    what is involved here.  So, it's a challenge to you.

14         With respect to the potential infringement, that's all

15    going to be experts, but with the patent itself I think both of

16    you are capable of doing that.

17         MR. DAVIS:  Your Honor, if I may, in almost all of the

18    patent trials that I have been a part of, in order to aid the

19    jury we have prepared binders that contain at least a copy of

20    the patent and the list of claim constructions so that at the

21    time --

22         THE COURT:  Would you please combine and agree to the

23    binder that you give to the jury?

24         MR. DAVIS:  Yes, sir, we can do that.

25         THE COURT:  And that binder will stay with the jury

K1G7KAU2

1     throughout.

2              MR. ABRAMSON:  Yeah.  I mean it should not be

3     argumentative; it should be straightforward, no spin to it.

4              THE COURT:  Right, right.

5              MR. DAVIS:  The other thing that I would --

6              THE COURT:  I won't say anything about sting, but no

7     spin.

8              MR. ABRAMSON:  No spin.

9              MR. DAVIS:  The other thing I would raise -- I'm not

10    sure your Honor is aware of this -- but the Federal Judicial

11    Center also has a video that they have made.

12             THE COURT:  I have seen the video; it's not to be

13    played.

14             MR. DAVIS:  Thank you.

15             THE COURT:  I don't care for the video.

16             How do you present exhibits?  Is it going to be on a

17    screen?

18             MR. ABRAMSON:  We have hard copies of the exhibits,

19    and we also are prepared to present them on the screen.  I

20    noticed that there are screens --

21             THE COURT:  The jury has screens.

22             MR. ABRAMSON:  I don't know where the screen is in the

23    courtroom.  Is that it, or is there another one?

24             THE COURT:  We have a screen.  We have a screen, and

25    people can access the screen through computers or through the

K1G7KAU2

 1    Elmo.

 2            MR. ABRAMSON:  OK.  So we have a screen, a projector

 3    and an Elmo, and I think that would be fine.

 4            The other question is publishing things to the jury.

 5    I guess that system does that to some extent.

 6            THE COURT:  There is in effect one screen for two

 7    jurors.  You can go look at it.  Have a look.

 8            MR. ABRAMSON:  I saw it.  I took a look at it before.

 9    It's pretty hard to see, I think, for two jurors.  They are

10    relatively small screens.

11            THE COURT:  I can't do better than that.

12            Bridget, we are talking about the presentation of

13    evidence.  We have a screen, right?  Yes.  We have a screen and

14    you can access the screen either from your computers or through

15    an Elmo.  You should work through what you are going to be

16    doing with the technician in the court.

17            DEPUTY COURT CLERK:  It's 805-0134.

18            THE COURT:  Make sure it's set up.  I have used that

19    in many cases -- used the system in many cases -- and the

20    jurors have no problem in seeing what they have to see.

21            MR. ABRAMSON:  The binder you referred to, is that

22    something you would make a copy for every juror?

23            THE COURT:  No, you don't have to do any copies at

24    all.  You don't have print.  You don't have to publish anything

25    or distribute anything.  It's on the screen and it's on their

K1G7KAU2

1    screens and my screen.

2               MR. DAVIS:  I'm sorry, I think the question that I

3    thought Mr. Kaufman -- the question I think Mr. Abramson was

4    asking about was the binders that we are going to agree to give

5    the jury.

6               THE COURT:  Only the patent and the patent

7    construction.

8               MR. DAVIS:  Right.  And so we will give each -- at

9    least with the Court's permission, we will give each one of the

10   jurors a binder that has those two things in it.

11              THE COURT:  Correct.

12              MR. ABRAMSON:  That's what I was asking.

13              THE COURT:  Correct.

14              MR. DAVIS:  OK.  And in terms of --

15              THE COURT:  And the exhibits themselves as they come

16   in, they will be premarked -- they have already been

17   premarked -- and you will present them through the screens.

18              MR. ABRAMSON:  What I had in mind was the binder that

19   we're going to meet and confer on, everybody gets that.  The

20   rest of them are published through the screens and presumably

21   go into the jury room for deliberations.

22              THE COURT:  Exhibits will not go in to the jury unless

23   they ask for it, but you will have them ready to present.  And

24   those hard copies will be better in that sense.

25              MR. DAVIS:  If I may, your Honor --

K1G7KAU2

1        THE COURT:  The jurors will each have notebooks, and

2   so they will take their notes, and they can take their notes

3   into the deliberation room, and if they want something, they

4   know how to call for it.

5        MR. DAVIS:  On behalf of Microsoft, your Honor, our

6   expectation was that we will be using a trial presentation

7   system to present the evidence electronically.

8        We also would -- with the Court's permission --

9   typically follow a practice whereby on direct and

10  cross-examination we would have a hard copy binder of the

11  exhibits that we intend to use so that the Court and the

12  witness and counsel would have at their fingertips.

13       THE COURT:  I read what you proposed in the pretrial

14  order, and I approve it.

15       OK.  I am looking at the bottom of page 9 of the

16  pretrial order.  The jury will not be given copies of discovery

17  responses.  Counsel can read what is an admission into

18  evidence.  To that extent the bottom paragraph is modified.

19  It's not clear to me what you want to use with deposition

20  evidence in addition to live testimony.

21       MR. ABRAMSON:  We have certain evidence -- well, we

22  have certain evidence -- documents, for example -- from

23  Microsoft that would come in.  It has to come in through

24  somebody, and that would be the vehicle.

25       THE COURT:  What documents?  By nature of admissions,

K1G7KAU2

1    you mean?

2              MR. ABRAMSON:  Yes, absolutely.

3              THE COURT:  So there is no dispute as to authenticity.

4              MR. ABRAMSON:  Not on those, I don't believe so.

5              THE COURT:  You can present it as an exhibit.

6              MR. ABRAMSON:  Yeah.  Normally I would want to have a

7    witness to put it in through.

8              THE COURT:  Why?  Who could be a witness to that?  A

9    lawyer?

10             MR. ABRAMSON:  In some cases the person who wrote the

11   document or who otherwise authenticated it during the

12   deposition.

13             THE COURT:  If it's a witness, then the witness comes

14   in and the normal rules of witnesses apply.  If it's an

15   admission, you can put it in yourself.  But you don't need

16   someone on the stand for admission.

17             MR. ABRAMSON:  If the Court will accept us just

18   offering documents as admissions, then we could probably -- I

19   understand we can eliminate the deposition, but we can limit

20   it.

21             THE COURT:  I'm not prepared to do that.  I don't know

22   what you have in mind.  I can't really rule on that.

23             Before we get into the exhibits --

24             MR. ABRAMSON:  I mean some of the deposition

25   testimony, the oral testimony at the deposition, is also in the

K1G7KAU2

1   nature of admissions.

2           THE COURT:  Let me be clear on this.  If there is a

3   live witness, there is no deposition testimony.

4           MR. ABRAMSON:  Understood.

5           THE COURT:  However, that which is admitted by the

6   party can come in separately.  You and Mr. Davis will put that

7   into evidence.  You will say page so and so, line so and so,

8   the following is offered as an admission of the party, and you

9   will offer it.

10          MR. ABRAMSON:  That's exactly what we have in mind.

11          THE COURT:  OK.  Mr. Davis?

12          MR. DAVIS:  Yes, sir.  Your Honor, with respect to

13   cross-examination, our expectation was that we would probably

14   have in reserve impeachment clips as necessary that we would

15   play by video if we needed to, and my understanding --

16          THE COURT:  You can present the video to the witness.

17   There is a screen.

18          MR. DAVIS:  And my understanding -- based on an

19   earlier transcript that I saw from your Honor -- is that what

20   your Honor would like is for us to first hand up the written

21   transcript so that your Honor can confirm that it's proper

22   impeachment, and then we can play the video?  Correct?

23          THE COURT:  Correct.

24          MR. DAVIS:  Thank you.

25          MR. ABRAMSON:  And Mr. Patchen reminds me that we do

K1G7KAU2

1    have a few video clips of Microsoft witnesses that we would

2    want to play -- people who are not appearing here live.

3               THE COURT:  People who are not appearing.

4               MR. ABRAMSON:  Yes.

5               THE COURT:  And you want them as witnesses.

6               MR. ABRAMSON:  Yes.

7               THE COURT:  Their entire testimony.

8               MR. ABRAMSON:  For certain clips from their deposition

9    testimony.

10              THE COURT:  And offering them as what?  Testimony?  Or

11   as admissions?

12              MR. ABRAMSON:  Testimony that provides admissions.

13              THE COURT:  Is this testimony as to something that a

14   witness saw, or heard, or did?

15              MR. ABRAMSON:  Yes.

16              THE COURT:  OK, so you put it in.  It's almost as if

17   that person is here.

18              MR. ABRAMSON:  Pardon me?

19              THE COURT:  That person can't come to the trial.

20              MR. ABRAMSON:  If that person can't come to the trial.

21              THE COURT:  You want the person here?

22              MR. ABRAMSON:  If the person is here, we could --

23              THE COURT:  Have you asked Mr. Davis to produce him?

24              MR. ABRAMSON:  We have asked.

25              THE COURT:  Mr. Davis?

K1G7KAU2

1          MS. EDELMAN:  We haven't received any trial subpoenas,

2     your Honor, for specific witnesses.  They have not specifically

3     asked us to present any witnesses in person.

4          THE COURT:  Live witnesses are much preferred.

5          MR. DAVIS:  Thank you, your Honor.  So what we have

6     agreed to in advance is that Microsoft was intending to bring

7     to the trial at least Mr. Groff and Mr. Hunter, and I believe

8     those were on counsel's list.

9          THE COURT:  Why don't you just talk together.  If

10    there is any dispute, bring it to me.  Otherwise --

11         MR. DAVIS:  Yes, sir.

12         MS. EDELMAN:  One related issue I would raise with the

13    videos.  And maybe I'm off base, thinking of something else.

14    But there were some videos played during the depositions of

15    Microsoft witnesses, and those videos I believe also appear in

16    the exhibit list, and I just want to clarify that --

17         THE COURT:  They're not exhibits.  They're not

18    exhibits.  They can use them in the cross-examination.

19         MS. EDELMAN:  OK.  OK.

20         THE COURT:  And if it's an admission, we don't need

21    pictures; we can just read it in from a transcript.

22         MS. EDELMAN:  Thank you, your Honor.

23         THE COURT:  OK.

24         MR. DAVIS:  Pardon me, your Honor, while thinking

25    about it, is it the Court's practice to submit to the jury

K1G7KAU2

1    trial testimony -- if it's requested -- in written form?

2              THE COURT:  When they're deliberating?

3              MR. DAVIS:  Yes, sir.

4              THE COURT:  If they ask for certain testimony to be

5    reread, generally I will have the reporter reproduce the pages

6    that are involved -- without objections and the like -- counsel

7    will review them and then they will go to the jury.

8              MR. DAVIS:  Understood.

9              THE COURT:  Yes, Mr. Abramson?  You're just

10   stretching?

11             MR. ABRAMSON:  Yes.

12             THE COURT:  All right.  What do you want me to do with

13   the objections?

14             MR. ABRAMSON:  Well, we have a long list of

15   objections.  I don't know whether your Honor wants to go

16   through them today or reserve them as they come up.

17             THE COURT:  I'd rather reserve them as they come up,

18   unless there is some principal that you want me to deal with

19   now.

20             MS. EDELMAN:  Nothing from Microsoft.  And we expect

21   that in light of your Honor's rulings today that many of the

22   exhibits and their objections would come out.

23             THE COURT:  OK, so I don't need to do anything for

24   this.

25             MS. EDELMAN:  No, our preference would be to deal with

K1G7KAU2

1   them as they would come up with the respective witnesses that

2   they would be brought in through.

3           THE COURT:  That's fine.

4           Avoid duplication of exhibits, please.  Have you done

5   that?

6           MR. ABRAMSON:  We have tried.  We have made an effort.

7           THE COURT:  I'm going to sign the pretrial order.  Do

8   you have the original?  And Ms. Jones will file it.

9           I'm going to file this one.

10          There will be eight people on the jury.  We will have

11  an array of 14.  I have your proposals for voir dire, and we

12  will go through them.

13          I will ask the questions.  If a person cannot sit,

14  another person will replace that juror.  And I will ask the

15  juror who is replacing if there are any answers that he wishes

16  to give me to any of the questions that I've asked.  If there

17  are, I will take them up, and we will make challenges for cause

18  as we go along.

19          At the end of this process there is a questionnaire

20  that is given that will address personal items:  Where were you

21  born?  Where do you live?  Who is in your household?  What

22  education you've had?  What jobs you've had?  What magazines do

23  you read?  What do you watch on the Internet?  So on.  And then

24  you will exercise your peremptories at your seat, three

25  peremptories each side.  You will give me the challenges on a

K1G7KAU2

1    note paper -- one from each side -- and then we will go into

2    the jury room and strike those who have been stricken.  If you

3    don't exercise all your peremptories or you coincide with your

4    exercise peremptories, I will excuse the highest numbered

5    backwards until we have a jury of eight, and that will be the

6    jury.

7                MR. DAVIS:  Your Honor, is it the Court's practice to

8    provide counsel with the list of the venire before the jury

9    selection begins?

10               THE COURT:  No.

11               MR. DAVIS:  Thank you.

12               MR. ABRAMSON:  It leaves room for the possibility to

13   lose two jurors?

14               THE COURT:  Can't hear you.

15               MR. ABRAMSON:  That leaves the possibility to lose two

16   jurors.

17               THE COURT:  That's right.

18               MR. ABRAMSON:  What about cause?  Challenges?

19               THE COURT:  There are no alternates.  As you challenge

20   for cause and it's granted, or a juror can't sit, another juror

21   from the overall array comes in here and fills the seat.

22               MR. ABRAMSON:  All eight jurors --

23               THE COURT:  Ms. Jones, how many people will you call,

24   I think?

25               DEPUTY COURT CLERK:  I called 25.

K1G7KAU2

1          THE COURT:  We have 25 people.  I think we need a few

2     more because it's going to be a month trial.  It will go Monday

3     through Thursday.  I have my overall calendar on Friday.  We

4     will go 10 o'clock to 5 o'clock.  There will be a midmorning 15

5     minute break, something like that.  Lunch is around one o'clock

6     for an hour and 15 minutes.  Usually jurors can dispense with

7     the afternoon break.  And we will go as close to as close to

8     five as we can.  Ms. Jones will keep the time and let you know

9     as we go along.

10          Your time estimate seems suitable to me, but priority

11     number one is to ensure that the jurors understand the case.

12     If you need more time, we will take it.  We are going to have

13     30 people come up.

14          MR. ABRAMSON:  Any expectation as to how far we will

15     get the first day?

16          THE COURT:  You should be prepared to put on your

17     first witness -- do the openings first.  And then you have the

18     claims construction, so it's not likely that we will have a

19     witness on for the first day.

20          All right.  I think I have said everything I need to

21     say.  Any questions, Mr. Abramson?

22          MR. ABRAMSON:  No questions, your Honor.

23          THE COURT:  Mr. Davis?

24          MR. DAVIS:  None, your Honor.

25          THE COURT:  I look forward to seeing you then.

K1G7KAU2

1          MR. ABRAMSON:  Thank you.

2          MR. DAVIS:  Thank you, your Honor.

3          THE COURT:  Can I get an agreed set of facts from you?

4          MR. ABRAMSON:  Pardon me?

5          THE COURT:  Can I get an agreed set of facts?

6          MS. EDELMAN:  Yes, your Honor, they were in the

7   pretrial order.

8          THE COURT:  We have it, OK.  I might shorten it.  And

9   I am not planning to give an elaborate set of preliminary

10  instructions.  I think all I need to say is that there are

11  going to be two phases to this trial -- the opening part of

12  this trial -- which will examine the validity of the patent and

13  whether or not the patent was infringed.  So plaintiff has the

14  burden of proving infringement by a preponderance of the

15  evidence -- and I will explain what a preponderance of the

16  evidence is -- and defendant has the burden of proving that the

17  patent is invalid by clear and convincing evidence.  And I will

18  attempt to define that.

19         And I will tell them that we start with a presumption

20  of validity, but if the defendant puts in evidence to question

21  that, the presumption disappears, and the defendant must then

22  be judged by whether he has proven his case by clear and

23  convincing evidence.  And then we start.  OK.

24         MR. ABRAMSON:  Thank you.

25         THE COURT:  Are any of your defenses to be tried to

K1G7KAU2

1    the judge and not to a jury?  Mr. Davis?  Like estoppel, for

2    example, is that really going to be --

3              MS. EDELMAN:  Your Honor, there are some defenses that

4    may be more appropriate for your Honor including estoppel.

5              THE COURT:  I think we will deal with that in the

6    closing conference.

7              MS. EDELMAN:  Yes, your Honor.

8              THE COURT:  We will have a conference at the end of

9    the case to go over the charge, and then we will carve out what

10   we need to carve out at that point.

11             That's it.  Thanks very much.

12             (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25